[L.A. No. 29950. In Bank. June 7, 1972.]

RONNA DILLON, Petitioner, v.
THE SUPERIOR COURT OF SANTA BARBARA COUNTY,
Respondent;
THE PEOPLE, Real Party in Interest.

**Counsel**

John M. Sink for Petitioner.

No appearance for Respondent.

David D. Minier, District Attorney, and Patrick J. McKinley, Deputy District Attorney, for Real Party in Interest.

**Opinion**

**PETERS, J.**—Petitioner Ronna Dillon seeks a writ of mandamus to compel respondent court to suppress the evidence discovered as a result of an alleged illegal search.

Petitioner is charged with violations of the following sections of the Health and Safety Code: 11530 (possession of marijuana), 11530.1 (planting and cultivating marijuana), 11530.5 (possession of marijuana for sale), 11555 (possession of paraphernalia used to smoke or inject narcotics), and 11910 (possession of restricted dangerous drugs). Petitioner and her codefendants pleaded not guilty and, after a hearing pursuant to section 1538.5 of the Penal Code, the superior court denied a motion to suppress the evidence discovered during the searches in question.

Insofar as a search of the house is concerned, this case is controlled by the decisions of the United States Supreme Court in *Chimel* v. *California*, 395 U.S. 752 [23 L.Ed.2d 685, 89 S.Ct. 2034], and *Vale* v. *Louisiana*, 399 U.S. 30 [26 L.Ed.2d 409, 90 S.Ct. 1969], and accordingly, we have concluded that the search of petitioner's house exceeded the scope of a search incident to a lawful arrest and that the evidence uncovered by that

search is inadmissible. However, we have also determined that the search of the backyard was proper.

In May of 1971, a day or two before petitioner's arrest, Mrs. Myrtle Lovelace, petitioner's neighbor, complained to the Santa Barbara Police Department that she could see plants growing in the yard of the house next door which resembled those advertised in the newspaper as being marijuana. The house where she could see these plants had been rented about a year and a half previously by petitioner. Mrs. Lovelace had noticed these plants growing for a period of about three weeks immediately prior to calling the police; she was suspicious because they were the only plants in the yard that were well cared for. She had never seen petitioner working around these plants. She was not sure whether she had seen the other defendants working around the plants either, although she did remember seeing an Englishman doing some work on these plants and trying to get one of the defendants (not petitioner) to help him.

On May 11, 1971, Detective Alpert of the Santa Barbara Police Department answered Mrs. Lovelace's complaint concerning the marijuana plants. He observed the plants to which Mrs. Lovelace had been referring. She lived in a two-story house and Alpert viewed the plants from her upstairs bedroom window without any optical assistance.

Apparently there was a fence separating the two yards. The closest distance from Mrs. Lovelace's house to where the plants were growing was about 20 or 25 feet. From his observation at the upstairs window he identified the plants as marijuana (some of which were 3½ to 4 feet high) because of their serrated leaves and odd numbered leaf count.

After leaving Mrs. Lovelace's house, Detective Alpert returned to police headquarters and apprised another officer of the plants he had seen. They discussed the advisability of getting a search warrant for the premises under observation but decided it was not necessary.

Detective Alpert, accompanied by two other officers, went to petitioner's house in an unmarked police vehicle. Upon arriving they saw no other suspects or any suspicious activities by any other possible accomplices. As they approached the front door of the house they saw petitioner through an open window of the dining room. Suspecting her as being the girl Mrs. Lovelace had referred to, Detective Alpert knocked, and petitioner answered the door. After identifying himself as a police officer he inquired whether she lived there. She replied that she did but was in the process of moving. He then informed her that he was there to investigate possible cultivation of marijuana and asked her to step to the rear of the house.

She agreed and accompanied the officers around the side of the house, through a gate, and into the backyard. Detective Alpert then saw the plants on the southside of the garage, inspected them, and arrested petitioner for cultivation of marijuana. (Health & Saf. Code, § 11530.1.)

After she was advised of her rights, petitioner indicated she did not wish to talk without an attorney present. She then asked if she could use her telephone to call a friend. Alpert said, "Yes, but one of us will have to go with you at the time." Thereupon, although nothing had been said about the other officers coming into the house, all three officers followed her into the house. The telephone was located in the living room just inside the front door which they had entered.[1]

Before petitioner made the telephone call, the police requested her consent to search the house. She refused. Nevertheless, Detective Alpert promptly searched the house. He found marijuana, restricted dangerous drugs and narcotics paraphernalia as a result of his search.

Shortly after petitioner commenced her telephone call, defendant Correale arrived at the house. Detective Alpert asked him if he lived there and, when he replied in the affirmative, arrested him. After being told of his *Miranda* rights and informed of the previous search, defendant Correale consented to having his bedroom searched again. Nothing was discovered which had not been noticed before. Petitioner and Correale were taken to jail.

Several hours later, Detective Alpert accompanied by another officer returned to petitioner's house to determine if anyone else was there. Defendant Harris was found and arrested after identifying himself. Detective Alpert explained to Harris that numerous articles of narcotics and paraphernalia had been found in the house, and that some had been found in the bedroom where Harris' identification had been discovered. Alpert then asked Harris' permission to search the bedroom to determine if anything had been missed. Harris agreed. Four items were found only one of which had been noticed before. He was subsequently taken to jail.

Of all the items found during both searches of the house, none was found in the room where petitioner had made her telephone call.

### I. THE SEARCH OF THE BACKYARD

Petitioner contends that the search of the backyard by the officers

---

[1] At no time did petitioner leave the living room while the search and other arrests were made.

accompanying petitioner was illegal, relying on *Vidaurri* v. *Superior Court,* 13 Cal.App.3d 550, 553 [91 Cal.Rptr. 704]. Petitioner's contention is without merit.

In *People* v. *Bradley,* 1 Cal.3d 80, 84-85 [81 Cal.Rptr. 457, 460 P.2d 129], and in *People* v. *Edwards,* 71 Cal.2d 1096, 1104 [80 Cal.Rptr. 633, 458 P.2d 713], our court held that the test to determine if there has been an illegal search is "whether the person has exhibited a reasonable expectation of privacy, and, if so, whether that expectation has been violated by unreasonable governmental intrusion. . . ." (*People* v. *Bradley, supra,* 1 Cal.3d at p. 84.) ■ In this respect it is a well settled rule that in seeking to justify a seizure without a warrant, objects that are fully disclosed to the eye and hand of an officer who has a right to be where he is, are admissible. (See *Mozzetti* v. *Superior Court,* 4 Cal.3d 699, 707 [94 Cal. Rptr. 412, 484 P.2d 84]; *People* v. *Marshall,* 69 Cal.2d 51, 57-58 [69 Cal.Rptr. 585, 442 P.2d 665].) Petitioner's reliance on *Vidaurri* v. *Superior Court, supra,* 13 Cal.App.3d 550, is misplaced as that case is clearly distinguishable from the instant case.

In *Vidaurri,* a state Agriculture Department inspector went to a residence to inspect citrus trees for pests. When he found no one at home, he entered the enclosed backyard by opening an unlocked gate. He found no citrus pests but he did pick a leaf from a plant he thought was marijuana and turned it over to the local police department. Police officers went to the residence the next day and again found no one at home. At the side of the house they observed a freshly planted but wilted marijuana plant. They then entered the backyard through the gate and searched for and found marijuana plants which they removed and kept as evidence. The homeowners were charged with cultivating marijuana and one of them, after his arrest, made a statement to the effect he only grew the marijuana for his own use. The trial court denied a motion to suppress the evidence.

In issuing the peremptory writ of mandate suppressing the evidence, the Court of Appeal found that the agriculture inspector's entry was illegal at the very outset and the evidence, which only came to light as the result of such illegality, was tainted and therefore inadmissible. The court did concede that Agricultural Code section 5023 was applicable in providing that "The commissioner, whenever necessary, may enter and make an inspection of any premises, plant . . . or thing in his jurisdiction," but held that this statute was subject to the limitations of sections 1822.50-1822.56 of the Code of Civil Procedure which permit inspection by a health (or building, fire, safety, etc.) inspector, *only upon issuance of a warrant.* (See *Tellis* v. *Municipal Court,* 5 Cal.App.3d 455, 458 [85 Cal.Rptr. 459];

*Camara* v. *Municipal Court,* 387 U.S. 523 [18 L.Ed.2d 930, 87 S.Ct. 1727].)

■ In the case at bar the officers observed the growing marijuana plants in plain view from the second floor bedroom of Mrs. Lovelace's house (a distance of approximately 40 feet) after receiving a complaint from Mrs. Lovelace. His observations were clearly legal and provided probable cause to believe that a crime was being committed.

The view of the backyard was vulnerable to observation by any of petitioner's neighbors, in essence, open to public view. The 3½- or 4-foot-high marijuana plants were in plain view, both to the neighbors and to the police officers. There was no violation of petitioner's "reasonable expectation of privacy" as required by *Bradley* and *Edwards.*

Finally, in the instant case petitioner agreed to walking around to the back of the house with the officers. Her consent to this action would clearly seem to prevent her from complaining of the alleged illegal search.

For the above reasons we have concluded that the officer's observations of the marijuana plants in petitioner's backyard made from an adjacent neighbor's home and the subsequent admittance to the yard with the consent of petitioner herself render the search legal.

## II. THE SEARCH OF THE HOUSE

The search of the house, having been made without a warrant, the burden rests with the prosecution to show proper justification. (E.g., *Horack* v. *Superior Court,* 3 Cal.3d 720, 725 [91 Cal.Rptr. 569, 478 P.2d 1]; *People* v. *Haven,* 59 Cal.2d 713, 717 [31 Cal.Rptr. 47, 381 P.2d 927].)

■ The search of the house may not be justified as incident to the petitioner's arrest because the arrest occurred outside the house.

In *Vale* v. *Louisiana, supra,* 399 U.S. 30, the police officers, possessing warrants for appellant's arrest, were watching the house where he resided. They observed what they suspected was an exchange of narcotics between a known addict and appellant outside the house, after appellant had gone into the house and brought something out to the addict. They arrested appellant at the front steps and announced that they would search the house. No consent was given by appellant.

Justice Stewart, writing for the majority, held that if a search of a house is to be upheld as incident to a lawful arrest, the arrest must take place *inside* the house, not somewhere outside—whether 2 blocks away (*James*

v. *Louisiana,* 382 U.S. 36 [15 L.Ed.2d 30, 86 S.Ct. 151]), 20 feet away (*Shipley* v. *California,* 395 U.S. 818 [23 L.Ed.2d 732, 89 S.Ct. 2053]), or, as in *Vale,* on the sidewalk near the front steps of the premises. Similar rules have long been applied in California. (E.g., *Tompkins* v. *Superior Court,* 59 Cal.2d 65, 67 [27 Cal.Rptr. 889, 378 P.2d 113]; *People* v. *Gorg,* 45 Cal.2d 776, 781 [291 P.2d 469].) In the instant case the arrest occurred outside the house.

Moreover, even if petitioner's arrest could be viewed as occurring in the house, the search of the house would still not be justified as incident to it. In *Chimel* v. *California, supra,* 395 U.S. 752, 762-763 [23 L.Ed.2d 685, 693-694], the court held that a search without a warrant incident to an arrest must be limited to the arrestee's person in order to discover and remove weapons and to seize evidence to prevent its concealment or destruction, and to the area within the immediate control of the person arrested, meaning the area from which he might gain possession of a weapon or destructible evidence.

In limiting the area within which the search without a warrant may be undertaken, the court reasoned that the search under such circumstances would prevent needless physical harm to both the officers and the arrestee and would preserve evidence necessary at the trial. The court emphasized that "There is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs—or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself. Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant. The 'adherence to judicial processes' mandated by the Fourth Amendment requires no less." (395 U.S. at p. 763 [23 L.Ed.2d at p. 694]; fn. omitted.)

The search of the house may not be upheld on the basis of the rule of *People* v. *Block,* 6 Cal.3d 239 [98 Cal.Rptr. 657, 491 P.2d 9], permitting searches for additional suspects. In *Block,* a police officer, after arresting defendant and five others during an alleged "pot party" at his house, went upstairs in a search of other possible suspects. While searching he observed marijuana.

The majority held that on the basis of the facts known to him, the officer had probable cause to believe, after the arrests had been made that other possible suspects might be in the building, and that he acted reasonably in making the upstairs search for them and in seizing the marijuana which was in plain view.

However, it was emphasized that in determining whether an officer's

belief that others were present and subsequent search for them was reasonable would be "dependant upon the existence of facts available to him at the moment of the search or seizure which would warrant a man of reasonable caution in the belief that the action taken was appropriate. [Citations.] And in determining whether the officer acted reasonably, due weight must be given *not to his unparticularized suspicions or 'hunches,'* but to the reasonable inferences which he is entitled to draw from the facts in the light of his experience; in other words, he must be able to point to *specific and articulable facts* from which he concluded that his action was necessary. [Citations.]" (6 Cal.3d at p. 244; italics added.)

Although the facts in *Block* presented a close case as to whether probable cause existed to search for further suspects,[2] the facts in the instant case do not.

The police officers received information from a neighbor that there were growing marijuana plants in petitioner's backyard, and a detective, did, in fact, observe the plants from that neighbor's house. Shortly thereafter, several police officers approached petitioner's house, rang the doorbell, and confronted petitioner who answered the door. They invited her to walk around the side of the house into the backyard with them. They then saw the plants closeup and *arrested her in the backyard* for cultivating marijuana. (Health & Saf. Code, § 11530.1.) They had no search or arrest warrants. Petitioner asked permission to go into the house to make a phone call. The police consented and followed her back into the house. She made the phone call from the living room located just inside the front door which they had entered. Petitioner never left that room. The police asked permission to search the house and she refused. While two officers stayed with petitioner the other searched all of the rooms in the house finding contraband in several of those rooms but none in the room where petitioner made her telephone call. None of the officers testified that he was in fear of his life or safety. The detective in charge admitted that he had no specific articulable information that any suspects were in the house at that moment; only general information that two other persons had been living at the house. There was no one else beside petitioner in the house at the time. Furthermore, when the officers first knocked on the door to escort the petitioner to the backyard they saw no one else in the house, no hurried movements by petitioner or anyone else, nor were they aware of any facts which might indicate the presence of someone other than petitioner in the house. Again, when they returned to the house to let the

---

[2] Though I dissented in *Block,* I concurred in the majority's statement of the basic rules, disputing only the majority's conclusion that the facts in *Block* established probable cause to search.

petitioner make her phone call, no hurried movements were observed, nor was there any indication that someone had been there while they were in the backyard. In addition, no lights, noises nor marijuana odors were observed emanating from any of the rooms.

There is, of course, always the possibility that some additional person may be found in a house outside of which an arrest took place. But the mere possibility of additional persons in the house, without more, is not enough to provide probable cause to search the entire premises for additional suspects once the suspect whom the officers had sought was arrested. As was stated in *Chimel* there is no justification "for routinely searching any room other than that in which an arrest occurs . . . ." (*Chimel* v. *California, supra,* 395 U.S. at p. 763 [23 L.Ed.2d at p. 694].) By holding the mere possibility that there might be an additional unknown person or persons in the house warrants a search of the entire premises the court would render the rule of *Chimel* largely meaningless.

We have concluded that the mere fact that the marijuana plants were found in the backyard and that two others had been living at the house, without additional facts, does not furnish probable cause to believe that others may be present in the house. The contraband found in the house as a result of the search is inadmissible.[3]

The alternative writ heretofore issued is discharged. Let a peremptory writ of mandate issue directing respondent court to suppress the evidence seized in the house. In all other respects the petition for writ of mandate is denied.

Wright, C. J., Tobriner, J., Mosk, J., and Sullivan, J., concurred.

**BURKE, J.,** Concurring and Dissenting.—I concur with the majority's conclusion that the evidence discovered in the back yard was not obtained by

---

[3]It is not claimed that the consents of Correale and Harris bring this case within *Mann* v. *Superior Court,* 3 Cal.3d 1 [88 Cal.Rptr. 380, 472 P.2d 468].

In *Mann,* the entry was freely consented to without any indication of coercion or involuntariness prior to any arrest or recitation of the *Miranda* rights. The court held that the entry was not tainted by a prior illegal search. "[T]he appropriate test is ' "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." ' "

The court, in determining whether the taint had been purged emphasized that a "defendant's consent may constitute such a sufficiently distinguishable means if it is not induced by compulsion, intimidation, oppressive circumstances, or other similar factors inherent in the situation which make that consent less than an act of free will." (3 Cal.3d at p. 8.)

Prior to consenting to the searches Correale and Harris were advised of the unlawful searches of their rooms and had been placed under arrest.

an illegal search. I disagree, however, with the majority's holding that the initial search in the house was unlawful and that evidence obtained by the subsequent search of Harris' bedroom was tainted by the prior illegal search. The initial search in the house was upheld, in my opinion properly so, by both the municipal court and the superior court, and the Court of Appeal properly denied the instant petition for mandamus.

Petitioner sought to suppress, inter alia, evidence found during the initial search in the house and evidence found during another, later search of Harris' bedroom. The municipal court and presumably the superior court, in concluding that the initial search in the house was lawful and the evidence thus found subject to seizure, relied upon the theory employed by the prosecutor, namely, that under the circumstances of this case it was reasonable for the officer to search in the house for suspects and that during the course of that search contraband observed in plain sight was subject to seizure. The prosecutor relied upon *Guevara* v. *Superior Court,* 7 Cal.App.3d 531 [86 Cal.Rptr. 657] (hg. den.), a case subsequently cited by us with approval in *People* v. *Block,* 6 Cal.3d 239, 245-246 [98 Cal. Rptr. 657, 491 P.2d 9]. The majority fail to adequately distinguish *Block* from the instant case or to even mention *Guevara.* Both cases, as we shall see, support the lower courts' conclusions.

Since petitioner was arrested in her backyard, the search in her house cannot be sustained as an incident to her arrest. (*Vale* v. *Louisiana,* 399 U.S. 30, 33-34 [26 L.Ed.2d 409, 412-413, 90 S.Ct. 1969]; *Chimel* v. *California,* 395 U.S. 752, 762-763 [23 L.Ed.2d 685, 693-694, 89 S.Ct. 2034].) However, as we noted in *Block* (at p. 243), "one of the 'well-recognized exceptions' [to the requirement of a search warrant] is . . . that 'objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence. [Citations.]' . . ." and a corollary of the "plain sight" rule is that " 'During a lawful search of premises for persons believed to be in hiding, police officers may seize contraband evidence "in plain sight." ' "

In *Block* we concluded that the search there in question was "a lawful search" for additional suspects. In that case an officer, after arresting the defendant and five others downstairs in a house during an apparent "pot party," went upstairs looking for possible suspects and there observed contraband in plain sight. In sustaining the search we stated (at p. 245) that the officer "had reasonable cause to believe, based upon facts available to him at the time he acted, that additional persons might be on the premises." We noted that specified matters known to the officer indicated

that a "pot party" was in progress involving an undetermined number of participants and that the lights illuminating the stairway and upstairs hall justified the further suspicion that other persons might be upstairs who were involved in the offense or who might pose a security risk for the arresting officers. We concluded that under the circumstances it was reasonable for the officer to act as he did and that contraband found in plain sight during the course of that search for suspects was properly seized. (See also *United States* v. *Briddle,* 436 F.2d 4, 7 [cert. den. 401 U.S. 921 (27 L.Ed.2d 824, 91 S.Ct. 910)], wherein court upheld seizure of evidence observed in plain sight during the agent's "conceded right to conduct a quick and cursory viewing of the apartment area for the presence of other persons who might present a security risk.")

In the instant case, as in *Block,* the officer had reasonable cause to believe, based upon the facts available to him at the time he acted, that additional persons might be on the premises who were involved in the offense[1] or who might be a security risk. Earlier on the same afternoon that the search was made Detective Alpert went to the home of a neighbor of petitioner in response to a complaint by the neighbor concerning plants resembling marijuana that were growing in the backyard of petitioner's home. The neighbor told Alpert that "she had seen people in the back of the yard. They appeared to be possibly pruning or keeping the plants up . . . ," that one of the people she had seen was an Englishman, that she had seen a female in the yard, and that *"there were other people living in the house."* (Italics added.) Before the search Detective Alpert also saw in petitioner's backyard 77 plants that on the basis of his training and experience he concluded were marijuana.

That Detective Alpert did in fact entertain a belief that others might be in the house who were involved in the offense or who might be a security risk is shown by his testimony that he "went through the house looking for possible suspects" and that he had his weapon unsnapped and uncovered although not drawn and went to the side of each bedroom and glanced in before entering.

The majority, in concluding that there was not reasonable cause for the officer to entertain that belief, indicate that the information possessed by Detective Alpert was that "two other persons had been living in the house."[2] The quoted words are misleading in that they, unlike the testi-

---

[1] The offense here is cultivation of marijuana.

[2] The majority also state that "The detective in charge admitted that he had no specific articulable information that any suspects were in the house at that moment. . . ." The record contains no such admission by the detective.

mony I have heretofore quoted, among other things, suggest that the others were no longer living in the house. The majority also rely in large part upon matters relied upon by the dissent in *Block,* such as that the officer did not testify specifically that he was in fear of his safety and that there was no evidence of hurried movements. Such matters were not determinative in *Block,* nor are they determinative here.

During the search for suspects Detective Alpert observed narcotics paraphernalia, restricted dangerous drugs, and marijuana, all of which it may be inferred were in plain sight, and under *Block* that evidence was properly seized.

Additional support for upholding the search and seizure is furnished by *Guevara* v. *Superior Court, supra,* 7 Cal.App.3d 531. In *Guevara* the officers arrested the defendant in his living room for selling heroin; one officer thereafter went through an open doorway connecting the living room and kitchen and observed contraband in plain sight in the kitchen. The court, in holding that evidence was lawfully obtained, stated (at p. 535), "the officer had a right to enter the kitchen to look for possible confederates of defendant. The informant had told the officers that defendant was living with a woman, that other persons frequented the apartment, and that a buyer from San Francisco was expected momentarily—in fact that a defendant had gone home to meet that buyer. Even if [a specified matter] was not sufficient corroboration to make [the informant] . . . 'reliable' . . . , it is clear that the officers had information as to other persons which it was their right, and their duty, to follow up. Having arrested defendant, it was not unreasonable for them to walk through the house to see if others were there and, if found, at least to interrogate them."

In my opinion the initial search of the house was lawful. A second search of the bedroom occupied by Correale, which search was made with his consent, revealed nothing that had not been discovered before. Another search was made of the bedroom occupied by Harris after he consented thereto, and additional incriminating evidence was discovered during that search. The majority order suppression of that evidence solely on the basis that it was tainted by the initial search of the house that the majority consider to be illegal, but since the initial search was legal the evidence was not tainted.

I would deny the petition for mandamus.

McComb, J., concurred.