[Crim. No. 21387. Second Dist., Div. Three. Dec. 15, 1972.]

THE PEOPLE, Plaintiff and Appellant, v.
RUFINO GUERRERO ABDON et al., Defendants and Respondents.

## COUNSEL

Evelle J. Younger, Attorney General, Herbert L. Ashby, Chief Assistant Attorney General, William E. James, Assistant Attorney General, Joseph P. Busch, District Attorney, Harry Wood, Harry B. Sondheim and Daniel L. Lieberman, Deputy District Attorneys, for Plaintiff and Appellant.

Richard S. Buckley, Public Defender, James L. McCormick, Harold E. Shabo, Leon Hitch, Harry W. Brainard, Richard A. Curtis, Deputy Public Defenders, Hanson & Egers and Mitchell W. Egers for Defendants and Respondents.

## OPINION

**FORD, P. J.**—The People have appealed from an order of the superior court setting aside an information (Pen. Code, § 995) by which the defendants Rufino Guerrero Abdon and Jimmie Florencio Abdon were accused of possession of heroin (count I), growing and cultivating marijuana (count II), and possession of marijuana (count III). (Pen. Code, § 1238, subd. (a)(1).)[1]

At the preliminary hearing the defendants made a motion to quash the search warrant on the ground of the insufficiency of the affidavit in support of the search warrant. The motion was denied.

The first witness offered by the People at the preliminary hearing was Gary Wilson, a narcotic agent for the State of California. At 1 p.m. on September 24, 1971, he arrived at the premises located at 9575 South Maie Street in Los Angeles, with respect to which he was in possession of the search warrant. He and Agent Watkins went to the front door of the one-story residence, each having his badge "out." Agent Watkins knocked on the door and stated: "Police officers. We are conducting a narcotics investigation. We have a search warrant. Open the door." The door was open but the screen door was shut. No one came to the door. Agent Wilson saw "an individual lying on the couch inside the house"; that person was the defendant Rufino Abdon. The officers opened the screen door and entered the house.

Other agents subsequently brought the defendant Jimmie Abdon into the house; he had been outside the house. The two men were placed on the couch and shown the search warrant. A search of the premises was then conducted. A probation department form bearing the name of Jimmie Abdon and the address of the house was found in the dresser in the back bedroom. Gas company receipts in the name of Dolores Abdon, 9575 Maie, and medical identification cards in her name were also found. Other documents discovered were a post card from the State Department of Human Resources addressed to Jimmie Abdon at 9575 Maie Avenue and a social security card in his name. Dolores Abdon was not present at the residence while the officers were there.

Agent Wilson further testified that a can of milk sugar was found in the dining room area. After testifying as to his experience and training in the

---

[1]A rehearing was granted in this case on November 21, 1972. This opinion is filed after the ensuing reconsideration by this court.

field of narcotics law enforcement, the officer stated: "Milk sugar is used to cut heroin. It is put in with heroin to dilute it." Behind the dresser in the back bedroom was found a "cellophane sandwich bag" containing what appeared to be "marijuana residue." Two balloons were found; one was a red balloon which was in the bottom drawer of the dresser in the back bedroom. The officer testified that "a common way of packaging heroin" was by means of balloons. Spoons, pieces of balloons and burnt match covers were also obtained, one plastic bag with the spoons and balloon pieces being found in the garage "adjacent to that address." The defendants were placed under arrest.

Agent Wilson further testified that what appeared to be two marijuana plants were "found outside the back door at the corner of the porch growing"; the "dirt appeared to have been dug up, and it was wet."

After the defendants were arrested they were advised of their rights. Agent Wilson asked the defendant Rufino Abdon if he lived at that address and Rufino said that he did.

On cross-examination by counsel for Rufino Abdon, Agent Wilson testified that he went to the house at 1 o'clock in the afternoon. He believed that it was on a Friday. After the statement was made that they were police officers conducting a narcotic investigation and had a search warrant, and after "Open the door" was said, the lapse of time before the officers opened the door was five or six seconds. He could see through the door and observe someone sleeping on the couch. When the officers entered, "Rufino Abdon then was in the process of waking up, and Agent Watkins advised him what . . . [they] were there for." A further portion of the witness' testimony was: "He advised him we were police officers. Again we displayed our badges. He advised him we were conducting a narcotics investigation and that we had a search warrant. At this time I showed him the original search warrant I had in my hand."

On cross-examination by counsel for defendant Jimmie Abdon, Agent Wilson testified that when he went to the location Jimmie Abdon was outside. Several agents went immediately to Jimmie, who was in the vicinity of some vehicles that were parked in the driveway. The witness further testified that at the time he noticed "somebody laying on the couch." He could not tell whether he was awake or asleep.

Agent Watkins testified that he had a conversation with defendant Jimmie Abdon in the back bedroom of the residence, which he related as follows: "I asked Jimmie Abdon, 'Is the heroin in the dresser drawer yours?' He stated, 'It is mine.' He later stated, 'The heroin is mine.' He also stated, 'The money is mine. Don't bust my wife.' "

Agent Watkins further testified that Jimmie Abdon requested a shirt and coat prior to being taken to be booked; they went into the middle bedroom and Jimmie Abdon "extracted a shirt and coat from a closet." Rufino Abdon requested a pair of shoes and Agent Watkins got a pair, which Rufino stated were his shoes, from the closet in the middle bedroom; Rufino put on the shoes.

Agent Watkins testified that there "was women's and men's clothing in the dresser" in the back bedroom. He further testified that Jimmie Abdon "was concerned about the women's clothing being next to the location of the narcotics."

Section 1531 of the Penal Code, relating to the execution of a search warrant, is as follows: "The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute the warrant, if, after notice of his authority and purpose, *he is refused admittance.*" (Italics added.) A provision of the nature found in section 1531 permitting an officer to break into a residence in the execution of a search warrant if, after notice of his authority and purpose, "he is refused admittance," is not to be given cursory effect. In *Masiello* v. *United States* (1963) 317 F.2d 121 [115 App.D.C. 57], Chief Justice Burger, then Circuit Judge Burger, stated (p. 123): "It would be a grave error to construe what we have said to mean that we are disposed to sustain all speedy entries and searches which are forcibly executed. Quite the contrary. We do so here only on the narrow grounds revealed by this record. Our concern with the importance of compliance with § 3109 [18 U.S.C. § 3109] is demonstrated by our earlier remand [footnote omitted herein] for the hearing now under review; close cases such as this will always receive careful appellate scrutiny. It is very desirable as an aid to appellate review that the facts concerning the required preliminary steps to entry should be developed and the factors relied on by the prosecution should appear in the record and be the subject of findings."

In *Commonwealth* v. *DeMichel* (1971) 442 Pa. 553 [277 A.2d 159], the officers, armed with a search warrant, arrived at the front door of the appellant's house at 12:40 p.m. They announced that they were police officers and had a warrant. Thereafter approximately 10 or 15 seconds elapsed before the officers broke in the door. The court, in the course of determining that the forcible entry violated the standards of the Fourth Amendment and that the fruits of the ensuing search were improperly admitted at the appellant's trial, stated as follows (277 A.2d at p. 163): "It is settled in this Commonwealth that the Fourth Amendment prohibition against unreasonable searches and seizures demands that before a

police officer enters upon private premises to conduct a search or to make an arrest he must, absent exigent circumstances, give notice of his identity and announce his purpose. [Citations.] The purpose of this announcement rule is that '. . . the dignity and privacy protected by the fourth amendment demand a certain propriety on the part of policemen even after they have been authorized to invade an individual's privacy. Regardless of how great the probable cause to believe a man guilty of a crime, *he must be given a reasonable opportunity to surrender his privacy voluntarily.*' United States ex rel. Ametrane v. Gable, supra, 276 F.Supp. at 559 (emphasis added). Accordingly, even where the police duly announce their identity and purpose, forcible entry is still unreasonable and hence violative of the Fourth Amendment if the occupants of the premises sought to be entered and searched are not first given an opportunity to surrender the premises voluntarily. See United States ex rel. Manduchi v. Tracy, supra, 350 F.2d at 662. [¶] The Commonwealth appears to concede this proposition of constitutional law but argues that the occupants of appellant's house were in fact given an adequate opportunity to open the door voluntarily. Corporal Hall and Officer Creden testified that they and the other officers began to break down the front door of appellant's house five to fifteen seconds after announcing their presence and purpose. We cannot deem this a reasonably sufficient period of time. In *Newman,* supra, for example, this Court stated that 'a mere twenty second delay in answering the door cannot constitute support for a belief that evidence was being destroyed . . . .' 429 Pa. at 448, 240 A.2d at 798. And in *Ametrane,* supra, the United States District Court for the Eastern District of Pennsylvania noted that '[e]ven if . . . [the occupant] had known the officers to be policemen, he might have had countless legitimate reasons for taking a minute to answer the door.' 276 F.Supp. at 559." In discussing the testimony of the appellant's wife to the effect that she was the person who peered at the officers through the window near the front door and that her delay in responding was occasioned by her being attired in a nightgown and having to go to the kitchen to put on a robe, the court stated (277 A.2d at p. 164): "Regardless of the truth of her testimony, it serves to illustrate that a five to fifteen second delay was insufficient for the police to have formed a reasonable belief that the occupants of appellant's house did not intend to permit peaceable entry."

The transcript of the preliminary hearing in the present case shows that the officers knocked on the door, gave notice of their authority and purpose, and demanded that the door be opened. Agent Wilson observed a person, who appeared to be sleeping, reclining on the couch inside the house. After waiting five or six seconds the officers entered the house. At that time, in the words of Agent Wilson "Rufino Abdon was then in the

process of waking up." It is thus manifest that there was no refusal of admittance, or action or inaction which could reasonably be understood by the officers to indicate a refusal, prior to the almost instantaneous entry of the officers. Accordingly, there being no exigent circumstances excusing compliance with section 1531, the entry was an illegal act on the part of the officers. Since the entry was illegal, the evidence obtained inside the house was the product of an illegal search and seizure and hence inadmissible. (See *People* v. *Thompson,* 6 Cal.App.3d 945, 951-952 [86 Cal.Rptr. 327].)

▇ The situation with respect to the two marijuana plants presents a more difficult problem. The testimony of Agent Wilson as to the location of the plants was as follows: "A. These two plants were found outside the back door at the corner of the porch growing. Q. By 'growing,' was there any dirt around them—was there anything done to the dirt around the plants? A. Yes. The dirt appeared to have been dug up, and it was wet."

The question to be resolved is whether, in spite of the illegal entry of the house, the finding and seizure of the plants was untainted by any illegality. In *People* v. *Bradley,* 1 Cal.3d 80, at page 84 [81 Cal.Rptr. 457, 460 P.2d 129], the Supreme Court stated: "A number of cases in upholding searches in open fields or grounds around a house have stated their conclusions in terms of whether the place was 'a constitutionally protected area,' . . . That phrase, however, does not afford a solution to every case involving a claim of an illegal search and seizure [citation], and we believe that an appropriate test is whether the person has exhibited a reasonable expectation of privacy, and, if so, whether that expectation has been violated by unreasonable governmental intrusion. [Citation.]"

In the present case the record fails to disclose whether the location of the growing plants was such as to make them visible to persons, such as delivery men, who would be expected to seek access to the house by means of the back door (see *People* v. *Bradley, supra,* 1 Cal.3d 80, 85) or such as to place them in the plain view of neighbors or others rightfully in a place which afforded a view of the plants (see *Dillon* v. *Superior Court,* 7 Cal.3d 305, 308 [102 Cal.Rptr. 161, 497 P.2d 505]). Consequently, bearing in mind that the search warrant in the present case was not properly executed, it cannot be said that the case of the People was brought within the rule expressed in *Dillon* as follows (7 Cal.3d at p. 310): "In this respect it is a well settled rule that in seeking to justify a seizure without a warrant, objects that are fully disclosed to the eye and hand of an officer who has a right to be where he is, are admissible."

Furthermore, returning to the nature of the entry of the house by the officers, since that entry was illegal at the very outset, the reasoning of *Vidaurri* v. *Superior Court,* 13 Cal.App.3d 550 [91 Cal.Rptr. 704], supports the determination that since the evidence of the growing marijuana only came to light as the result of such illegality, it was tainted and therefore inadmissible. (See *Dillon* v. *Superior Court, supra,* 7 Cal.3d 305, 310.)

The order setting aside the information is affirmed.

Cobey, J., concurred.

**ALLPORT, J.**—I dissent:

In my opinion the actions of the officers in executing the search warrant substantially complied with the provisions of section 1531.

A petition for a rehearing was denied January 11, 1973. Allport, J., was of the opinion that the petition should be granted. Appellant's petition for a hearing by the Supreme Court was denied February 15, 1973.