[Civ. No. 44552. First Dist., Div. Three. Dec. 26, 1978.]

OSCAR A. RODRIGUEZ, Petitioner, v.
THE SUPERIOR COURT OF SANTA CLARA COUNTY,
Respondent,
THE PEOPLE, Real Party in Interest.

COUNSEL

Rose & Dettmer, Ronald W. Rose and Thomas H. Dettmer for Petitioner.

No appearance for Respondent.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Derald E. Granberg and John H. Sugiyama, Deputy Attorneys General, for Real Party in Interest.

OPINION

**WHITE, P. J.**—We are petitioned for a writ of mandate following the finding of the Superior Court of Santa Clara County (Marc B. Poche, Judge) that two inaccurate statements in affidavit supporting search warrant were reasonable errors made in good faith and therefore did not have to be excised pursuant to the holding of *Theodor* v. *Superior Court* (1972) 8 Cal.3d 77, 100-101 [104 Cal.Rptr. 226, 501 P.2d 234].

Trial, which was initially set for July 10, 1978, was stayed by this court until petitioner's contentions could be fully considered. We issue the peremptory writ of mandate for the reason that affidavit in support of the search warrant contains intentional misstatements of fact. (*People* v. *Cook* (1978) 22 Cal.3d 67 [148 Cal.Rptr. 605, 583 P.2d 130].)

On June 1, 1978, the superior court filed memorandum of decision determining that the affidavit in support of search warrant contained two inaccurate statements and that the burden was on the prosecution to demonstrate the reasonableness of the misstatements. The inaccuracies

are: (1) "On the tape, OSCAR RODRIGUEZ was heard to say that he would be replenishing his supply of heroin shortly," and (2) "Your Affiant has learned on October 7, 1977, from the above informant that OSCAR RODRIGUEZ has indicated to informant that he (RODRIGUEZ) will be traveling to the Los Angeles area on or about October 14, 1977, and October 15, 1977, to purchase a fresh supply of heroin for resale in the San Jose area."

On June 9, 1978, a hearing was held to determine whether the misstatements were wilful, unreasonable, or reasonable. The court determined that the prosecution met its burden and that the misstatements would not be excised.

The affidavit recites that Officer Morin, the affiant, had learned the following from Officer Asencio, another officer investigating Rodriguez' activities: A confidential reliable informant told Asencio on October 5, 1976, that Rodriguez dealt in large quantities of heroin and that Sam Bass dealt heroin for him. Asencio purchased heroin from Sam Bass and arrested him for sale of heroin. While Asencio was at Sam Bass' residence in December of 1976 Rodriguez telephoned Sam Bass four times attempting to set up a time to deliver one ounce of heroin.

Asencio told Morin that Sam Bass had accompanied Rodriguez to Los Angeles and Arizona to purchase one kilo of heroin and that the confidential informant told Asencio that Rodriguez (Oscar) supplied his brother Joseph Rodriguez with heroin from Los Angeles.

The affidavit also recites: Morin took part in the arrest of Joseph Rodriguez for a five-ounce sale of heroin in August of 1977. Morin learned from another confidential reliable informant that Rodriguez traveled to the Los Angeles area to purchase large amounts of heroin, and that Oscar and Joseph Rodriguez were partners in the purchase of heroin from the Los Angeles area. This informant and a friend said that they had purchased heroin from Joseph Rodriguez on numerous occasions.

In September of 1977, Morin learned from still a third confidential reliable informant that he had personally purchased heroin from Oscar Rodriguez within the last four months and that Alex Flores used to deal heroin for Oscar. In September of 1977 Morin talked to Flores who said that he used to deal large quantities of heroin for Rodriguez, but that because of an argument over a narcotics transaction within the last four months he no longer sells for Rodriguez.

On October 3, 1977, Morin strip-searched a fourth confidential reliable informant who then went to Oscar Rodriguez' residence and purchased $800 worth of heroin. The buy was monitored on tape. The affidavit recites the misstatement that: "On the tape, OSCAR RODRIGUEZ was heard to say that he would be replenishing his supply of heroin shortly." After the buy was completed, the informant turned over material positively tested for heroin. The informant related that he observed what he believed to be additional heroin in Rodriguez' residence.

This same informant stated that he accompanied Rodriguez to Los Angeles approximately four months earlier and that they had purchased heroin which he carried into San Jose aboard Pacific Southwest Airlines in the company of Rodriguez. The informant told Morin that Rodriguez transacted narcotic business from vehicles and gave the license plate numbers.

In the affidavit Morin described Rodriguez' residence and location. He then made the second misstatement—that Rodriguez indicated that he would be traveling to Los Angeles on October 14 and 15 to purchase heroin to be resold in the San Jose area. The affidavit concludes: "Based on the above, your Affiant believes that some time on or about the 16th of October, said OSCAR RODRIGUEZ will have in his possession a supply of heroin. Since it is unknown when RODRIGUEZ will return from the Los Angeles area, and since your Affiant believes it is essential to execute this Search Warrant at the earlies [*sic*] opportunity following said suspect's return, it is requested that the Search Warrant be endorsed for nighttime service."

At the June 9, 1978, hearing, Morin agreed on direct examination about the first misstatement that the tape does not "per se" contain the words of Rodriguez saying he would be replenishing his heroin supply shortly. Morin explained that he believed his statement to be true because of the following facts known to him. Rodriguez agreed to go to Los Angeles with the informer (Keys) to "carouse" since both their wives were pregnant. Keys had been to Los Angeles before with Rodriguez to purchase heroin. The history of Rodriguez' relationship with Los Angeles in the past was to go there to purchase heroin. The heroin that the informer was buying from Rodriguez was more expensive than usual, which indicated that Rodriguez had either run out of his Los Angeles supply or was low and therefore had to make a local purchase to supply the informer on this occasion (which was more expensive). Keys had told Morin that Rodriguez did not like to use his savings or own money to

purchase heroin in Los Angeles. He either used profit from sales or someone else's money. Keys had just given him $1,200, $800 for the heroin and $400 to pay back a debt. Therefore, Rodriguez had money available to make the trip to Los Angeles to purchase heroin.

In regard to the second misstatement that Rodriguez would be going to Los Angeles on October 14 and 15, Morin explained on direct examination that Keys had told him that he and Rodriguez would be going to Los Angeles on that weekend but as it got closer to the time of departure and Keys was pressed by the police for the exact travel plans, Keys became more and more evasive. Finally, Keys said that he did not want to "go along" with the police anymore. Morin interpreted this action by Keys to mean that as it got closer to the time for them to leave, Keys became more and more apprehensive, which meant that Keys and Rodriguez were really going on that weekend. Then Morin attempted to find Rodriguez by going to his house, his place of work and his in-laws. When he saw no sign of Rodriguez, Morin believed this to mean that Rodriguez had gone to Los Angeles that weekend.

On cross-examination, Morin admitted that as to the first misstatement, heroin was not mentioned on the tape in regard to the Los Angeles trip. In fact, Keys was the one who suggested that he and Rodriguez go to Los Angeles to "carouse around." Rodriguez merely said that maybe he would and maybe he would not go. At the end of the conversation, Rodriguez said it would be nice to get away again sometime. The only "commitment" that Rodriguez made was to the effect that if he decided to go with Keys to Los Angeles, he would let Keys know.

As to the second misstatement, Morin testified on cross-examination in regard to the October 7 conversation with Keys. Morin stated that he talked with Keys on the 7th because it was Friday and he wanted to know if Keys and Rodriguez were going to Los Angeles that weekend—Keys said not that weekend but the following weekend, which would be the weekend of the 14th and 15th. However, on the 10th, Morin had another conversation with Keys. At this time, Keys began to equivocate, saying that he might not go because he did not have enough money. Finally on October 12, Keys "dumped" Morin.

It turns out that Morin did not attempt to determine if Rodriguez had left San Jose until *after* he had obtained the search warrant. Morin admitted that his first priority was to obtain the search warrant.

Further, while undergoing cross-examination, Morin discovered that the search warrant was not executed until October 22, one week after the warrant was issued, instead of on the 15th, as he had been assuming for most of his testimony. Therefore, by the time the warrant was served, Morin knew that Rodriguez had not gone to Los Angeles on October 14 or 15, knew that Rodriguez' wife was in the hospital on the 21st for delivery of her child and that Rodriguez was probably with her in the hospital. Moreover, Morin knew that the warrant would soon expire if it was not served quickly and felt that he had "a search warrant that wasn't worth the paper it was written on." In fact, Morin admitted that when he served the warrant he really did not think that Rodriguez had gone to Los Angeles. The record reveals the following: "Q: So, at the time you served the search warrant, were you wasting your time, did you think? A: Yes, only because it was my conclusion that where Oscar had been for the last couple of days had been with his wife and not in L.A. and he didn't go the weekend before and he didn't go the weekend before that, so I had the search warrant, but there was always that outside possibility."

Morin testified that he did not make the misstatements intentionally and that he was not attempting to enhance the probable cause to get a search warrant.

The superior court determined that the inaccuracies were nonwilful and were reasonable misapprehensions not needing to be excised.

■ In *Theodor* v. *Superior Court, supra,* 8 Cal.3d 77, the Supreme Court held (at pp. 100-101) that false statements in the affidavit supporting the search warrant must be excised if the affiant was unreasonable in believing the truth of such information; the probable cause to issue the warrant is then tested from the remaining truthful information. While the affiant is not held to a standard of absolute accuracy (*Theodor, supra,* at p. 100), mere good faith belief in the accuracy of the facts contained in an affidavit is insufficient (*Theodor, supra,* at p. 98). The affiant is held to the same standard of a reasonable factual deduction as to matters which later are discovered to be false as an officer is in acting without a warrant. (*Id.,* at p. 100.) Thus, if the facts and circumstances within the officer's knowledge would lead a person of reasonable caution to believe the truth of the statement, the reasonableness test is met.

The *Theodor* court expressly left open the question of whether excision was an adequate remedy if the misstatements were not merely unreasonable misapprehensions, but were deliberate falsehoods. Prior to argument

in this cause the Supreme Court of California filed its decision in *People v. Cook, supra,* 22 Cal.3d 67, which answered that question. *Cook* holds that if misstatements in affidavits are *intentional,* evidence seized pursuant to the warrant must be suppressed even if excision of the misstatements would have left sufficient information to provide probable cause to search. ■ Since we here determine that the two misstatements made in this case were intentional we need not consider questions of reasonableness or whether probable cause would have existed had the statements only been excised. We are compelled by *Cook* to invalidate the search and order suppression of all evidence seized under the warrant.[1]

■ *People* v. *Cook, supra,* makes it clear that once a misstatement has been shown by the defendant, the prosecution has the burden of showing only reasonable grounds to believe the statements were true. The burden is upon the defendant to produce evidence of the affiant's knowledge of falsity. (*People* v. *Cook, supra,* at p. 89.) However the defendant need only prove the affiant's knowledge by a preponderance of the evidence (*id.,* at p. 89), and the defendant "will have the benefit of the rule that a sworn misstatement made with conscious indifference to whether it is true or false is deemed the equivalent of an allegation actually known to be untrue." (*Id.,* at p. 90.)

■ The thrust of the People's position is that Officer Morin made his two "somewhat misleading" averments unintentionally and as the result of reasonable conduct. However, the elements of Officer Morin's actions should be subdivided and analyzed carefully. There is no doubt that Officer Morin knew that the statements "On the tape, OSCAR RODRIGUEZ was heard to say that he would be replenishing his supply of heroin shortly" and "Your Affiant has learned on October 7, 1977, from the above informant that OSCAR RODRIGUEZ has indicated to informant that he (RODRIGUEZ) will be traveling to the Los Angeles area on or about October 14, 1977, and October 15, 1977, to purchase a fresh supply of heroin for resale in the San Jose area" were not accurate. He knew that Oscar Rodriguez had said no such thing on the tape and that Rodriguez

---

[1] Were we not convinced that the officer here made intentional misstatements, we would be required to consider another serious problem with the affidavit: whether an officer who, after a warrant issued, becomes aware of facts that cast doubt on the probable cause contained in the affidavit, should be under a duty to apprise the magistrate of the new facts so that a new determination of probable cause can be made. Stated another way, can a search be upheld as "reasonable" when the officer who makes it realizes, as did Morin here, that the warrant is not worth the paper it is written on? We have difficulty imagining the argument that would make such a search proper.

had not told the informant that he would be traveling to Los Angeles or that his purpose would be to resupply with heroin. He knew that the statements attributed to Oscar Rodriguez were vastly different from those actually made and that only the process of interpretation by Morin made the *thrust* of the statements even vaguely accurate.

What is at issue here is how much of the interpretation process the police officer may undertake without informing the court that he is expressing conclusions from facts, not the facts themselves. Here, Officer Morin's interpretations of facts were translated into specific factual averments only after an involved distillation in the officer's mind. As to the first misstatement that Rodriguez was *heard* to say that he would be replenishing his supply of heroin shortly, not only was heroin never mentioned but also Rodriguez did not even commit himself to go to Los Angeles. The entire conversation in regard to Los Angeles was initiated and promoted by Keys. Rodriguez was, at best, noncommittal. Morin's knowledge of Rodriguez' prior trips to Los Angeles to purchase large quantities of heroin for resale in the San Jose area, and his belief that Rodriguez was low on his supply suggested to *Morin* that there might be a resupply trip soon, but they did not indicate that *Rodriguez* himself expected such a trip to take place, as suggested by the misstatement.

The second misstatement, that Rodriguez would be traveling to the Los Angeles area on or about October 14 and October 15 to purchase heroin, is inextricably bound to the first misstatement. That is, because Morin believed that Rodriguez was going to go to Los Angeles to purchase heroin, Morin's attempt to determine an exact date for the southern trip was influenced by his belief that such a trip would take place for this purpose. Therefore, the equivocal acts of Keys were believed by Morin to be sure signs that such a trip would take place on the dates specified. Then Morin translated his belief that such a trip would take place on the mentioned dates into a positive statement that Rodriguez had indicated to the informant that he *would* take such a trip for such a purpose.

The People do not argue that Officer Morin did not intend to make the statements he made in the affidavit. The only contention by the People is that Officer Morin acted reasonably in concluding that Rodriguez was going to go to Los Angeles to replenish his heroin supply and that it was not improper for him to conceal his reasoning process and to state his conclusions as if they were exact quotes or statements from the defendant.

Officer Morin's reasoning process may have been faultless and his conclusion about Rodriguez' intention to go to Los Angeles accurate.[2] But those possibilities do not convert his wilfully inaccurate statements into reasonable misstatements. Officer Morin's misapprehension was not of the facts, but of the law, believing in effect, that he was the magistrate and that the magistrate's function was only ministerial.

The *Cook* court's reason for not merely excising wilfully inaccurate statements was that to do so would be to ignore the time-honored caution that a witness false in one part of his testimony is to be distrusted in others. (*Id.,* p. 86, fn. 8.) The misstatements here are of the type which should invoke that caution. If Officer Morin could misstate Rodriguez' involvement in the trip to Los Angeles, he could as well have misstated the information relating to Rodriguez' alleged involvement in large-scale narcotics trafficking in the county.

The principles of *Theodor* and *Cook* are designed to insure that accurate facts are given to the magistrate in order that he or she may determine probable cause. Where the misapprehension about a particular *fact* is reasonable, excision is an adequate remedy because other facts are probably not affected by the misapprehension. But where, as here, the misapprehension is of the officer's *duty to provide accurate facts,* it necessarily infects the entire affidavit.[3]

Let the peremptory writ of mandate issue ordering the trial court to suppress evidence seized pursuant to the herein search warrant.

Feinberg, J., and Halvonik, J., concurred.

---

[2]Though the subsequent events cast great doubt on Morin's conclusions about Rodriguez' intentions.

[3]We do not mean to suggest that whenever an officer states his conclusions as if they were the underlying facts he has made an intentional misrepresentation invalidating the warrant. Here, however, the nature of the misstatements unmistakably shows a "conscious indifference to whether [the statements were] true or false." While we are in no position to draw a line between permissible police interpretation and usurpation of the magistrate's function, we will suggest that an officer who merely replaces the word "stuff" with "heroin" in quoting a conversation or performs a similar routine interpretation would not be revealing "conscious indifference" to the truth or falsity of his statement within the meaning of *Cook.* We should also note that most decisions about whether "conscious indifference" has been shown will be factual decisions by trial courts after the officer has explained his reasons, both for his conclusions and for his manner of preparing the affidavit. Here, however, no explanation by the officer could excuse his taking several perceived facts through a multi-step reasoning process and representing to the magistrate that the conclusions were actually facts perceived. For that reason we decide this case as a matter of law.