[Crim. No. 36226. Second Dist., Div. Five. Nov. 13, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
MARSHALL ELLIOTT BREVETZ, Defendant and Appellant.

66

**COUNSEL**

Paul Arthur Turner and Donald R. Wager for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow, and Christine C. Franklin, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**MARGOLIS, J.\***—Appellant (sometimes referred to as Brevetz) pleaded guilty to count II of a two-count information after his motion under Penal Code section 1538.5 was denied. In count I, appellant was

---

\*Assigned by the Chairperson of the Judicial Council.

charged with possession of cocaine in violation of Health and Safety Code section 11350, subdivision (a); in count II, he was charged with possession of cocaine for purpose of sale in violation of Health and Safety Code section 11351. After the plea of guilty to count II, the People dismissed count I.

In this appeal from the denial of the section 1538.5 motion (see Pen. Code, § 1538.5, subdivision (m)) appellant relies principally upon *People* v. *Cook* (1978) 22 Cal.3d 67 [148 Cal.Rptr. 605, 583 P.2d 130]. *Cook* is a progeny of *Theodor* v. *Superior Court* (1972) 8 Cal.3d 77 [104 Cal.Rptr. 226, 501 P.2d 234].

In *Theodor*, our Supreme Court held that "pursuant to a motion under Penal Code section 1538.5, a defendant may challenge the factual veracity of an affidavit in support of a [search] warrant and if statements contained therein are demonstrated to be false and if the affiant was unreasonable in believing the truth of such information, those facts must be excised from the affidavit and probable cause tested from the remaining truthful information." (8 Cal.3d at pp. 100-101.)

In *Cook*, the court held "that both the rationale of *Theodor* and the purposes of the constitutional guarantee of freedom from unreasonable searches and seizures compel the exclusion of evidence obtained pursuant to a warrant issued on an affidavit containing deliberately false statements of fact, regardless of the effect of those statements on probable cause." (22 Cal.3d at p. 75.)

Larry Homenick is a United States deputy marshal. Kenneth Kipp is a Ventura County deputy sheriff whose principal assignment is narcotics investigation; Kenneth's brother Michael Kipp is also a Ventura County deputy sheriff.

In April 1979, Homenick and his partner had a warrant to arrest Brevetz for violation of federal probation. They knew that when Brevetz was arrested in December 1978, he had a sawed-off shotgun under his bed and a large Doberman dog. Homenick called for backup assistance and Michael and another deputy arrived at Brevetz' residence.

Homenick knocked on the door, announced his purpose, and demanded entry. Brevetz, carrying a telephone and leading a Doberman dog, appeared on a patio above Homenick. When Homenick again identified himself, announced his purpose, and demanded entry, he also directed

Brevetz to secure the dog on the patio. Instead, Brevetz went inside the residence. Homenick heard the sound of a faucet turning and water running and pots and pans being tossed about. Ultimately, Homenick forcibly entered the back door and the other officers followed. Brevetz stood in the hall with the dog. When Homenick told Brevetz to secure the dog or the dog would be killed because it was barking and baring its teeth, Brevetz placed the dog in a bedroom and closed the door. Brevetz was handcuffed and placed in a chair near the hallway entrance to the living room area.

The officers were quite concerned that there might be other persons in the residence. Brevetz was on probation for harboring a fugitive. While waiting outside the residence before entering, the officers had observed Cynthia Hawthorne leaving the premises; the officers did not know how many people might still be in the house.

The officers observed paraphernalia usually associated with the packaging of narcotics in the kitchen and dining room. They believed that packaging usually involves more than one person. Also, Michael testified that Brevetz was very emphatic about getting his dog into the bedroom very quickly and for that reason Michael thought that possibly someone was inside the bedroom hiding.

The officers removed a vial containing white powder and $3,131 in cash from Brevetz' person. Homenick observed in plain a view a white powdery substance and some baggies on the dining table. Also there was a mirror with a powdery residue. Homenick formed the opinion that the powder on the table was cocaine.

In the kitchen a cellophane baggie containing white powder floated in water in a large pan in the sink. Also there was some powder floating in the water. Homenick also saw in the kitchen cupboard in plain view a scale covered with white powder residue. The shelf area around the scale was also covered with a powder residue.

Michael checked various rooms to determine if other persons were present. He checked the bedrooms and baths and then the kitchen where he observed the contraband and paraphernalia which Homenick had seen.

Michael then proceeded to open a hall closet. In the right portion of the closet there was a flight bag, boxes and other objects piled three to

four feet high. Michael wanted to be able to look behind the pile of objects to be certain that no one was hiding there and he asked Brevetz if he could remove the flight bag. He held up the bag and said "This bag." Brevetz claimed that he had never seen it before although the bag had tags with Brevetz' name on them. Michael unzipped the bag and saw inside it several plastic bags containing white powder and some felt bags. He looked into one felt bag and saw that it contained plastic bags containing white powder. At that point Michael feared that he might have gone too far and that he might have made an illegal search. He replaced the bag in the closet.

At Homenick's request, Michael called his watch commander by telephone and told him there was a possibility of a large quantity of cocaine or other drugs in the residence.

At the officers' insistence, Brevetz removed the dog from the bedroom. No one was in the bedroom. Michael opened the bedroom closet and saw a large pan containing white powder. By this time the officers had been in the residence approximately 20 minutes. Michael also found a pan containing cocaine in the laundry.

A few minutes later, Kenneth arrived and he spoke with Homenick and Michael. When Michael began to tell his brother Kenneth about the flight bag, Kenneth cut him off and said he wanted to hear no more about it. Michael did not tell Kenneth that he had opened the bag. Kenneth left to obtain a search warrant.

In his affidavit in support of the warrant, Kenneth stated that he reached the conclusion that Brevetz had been packaging cocaine when Homenick knocked on the door and that he reached this conclusion independently of any observations of Michael. At the end of his affidavit, Kenneth went on to say that based on the information he received from Homenick and his own personal observations, it is his opinion that the premises contained a large amount of cocaine and associated paraphernalia for packaging and sale of cocaine and that this opinion is reinforced by the observations of Michael.

 Initially, it is clear that probable cause to issue the search warrant was established by the vial and the large amount of money taken from Brevetz' person and the observations of Homenick and Kenneth in the dining room and kitchen.

Kenneth had to make a decision how to handle in his affidavit the matter of the flight bag. He believed that to have said nothing would have been wrong. He stated in his affidavit that Michael told him that "when he opened a closet immediately adjacent to where Brevetz had been standing with the dog he could see an open bag containing numerous baggies of crystalline white powder."

It is this statement that appellant argues is deliberately false, or, at least, Kenneth did not know whether it was true or not. In either event, appellant asserts, the application of the *Cook* rule should result in all evidence seized being suppressed.

Michael testified that he told his brother Kenneth that he had opened the flight bag. On cross-examination, however, Michael testified that he did not tell Kenneth that he had opened the bag because Kenneth had cut him off and stopped the conversation about the bag before Michael could say anything about the bag being opened or closed. Significantly, when Kenneth saw the flight bag it was open.

At the section 1538.5 hearing the trial judge concluded that Kenneth was understandably confused about the state of the bag when Michael first saw it. The trial judge concluded that there were no deliberate falsehoods in the affidavit, there were no reckless misstatements of fact, and there were no statements in the affidavit which Kenneth was unreasonable in believing.

Kenneth's concern apparently had to do with his knowledge that Michael picked up and then replaced the bag—not with any knowledge concerning Michael having opened the bag. This is the thrust of Kenneth's testimony. While it is true that Kenneth adopted somewhat of a "hear no evil, see no evil, speak no evil" approach, it does not appear that his desire not to hear further from Michael about the flight bag should affect the outcome here. His concern was that Michael might have made a technical error by moving the bag. We believe that by stating the facts as he did in his affidavit and disregarding the observations of Michael, Kenneth discharged his duty to the court.

The trial judge was persuaded that Kenneth was truthful and we have no reason to disagree. Kenneth's affidavit is not deliberately or recklessly false. He told the truth as he understood it.

■ "An affidavit need not disclose every imaginable fact however irrelevant. It need only furnish the magistrate with information, favorable and adverse, sufficient to permit a reasonable, common sense determination whether circumstances which justify a search are probably present. [Citations]." (*People* v. *Kurland* (1980) 28 Cal.3d 376 at p. 384 [168 Cal.Rptr. 667, 618 P.2d 213].) Clearly this requirement was satisfied.

*Kurland* recognizes that even intentional omissions of fact "are not necessarily an effort to mislead the magistrate." (*Id.*, at p. 387.) Omissions do not always render an affidavit inaccurate—only material omissions have that effect. ■ The charged omission of facts here cannot, in all of the circumstances, be said to be material.

There is no need to excise portions of the affidavit to test probable cause (*Theodor* v. *Superior Court, supra*, 8 Cal.3d 77) because Kenneth stated in his affidavit that he did not rely upon any of the observations of Michael. Disregarding Michael's observations, probable cause for the issuance of the warrant was clearly present.

*Rodriguez* v. *Superior Court* (1978) 87 Cal.App.3d 822 [141 Cal.Rptr. 233], cited by appellant, is inapplicable. In *Rodriguez*, the court characterized the officer's statements as "wilfully inaccurate." (*Id.* at p. 831) That conclusion brings that case under the *Cook* rule. As we have already pointed out, the case at bar is factually different from and not controlled by *Cook*.

■ Appellant challenges the search of the bedroom (where a large pan containing white powder was seen) as being unnecessary as a search for other persons. Given the facts known to the officers at the time the search was reasonable. The fact that it occurred some 20 minutes after the officers entered the residence does not compel a different conclusion, especially since the dog had been placed in the bedroom and was there during most of that time. Michael did not remove the pan. Kenneth, in establishing probable cause for the issuance of the search warrant, disregarded Michael's observations.

*Dillon* v. *Superior Court* (1972) 7 Cal.3d 305 [102 Cal.Rptr. 161, 497 P.2d 505], cited by appellant, is inapplicable. In *Dillon*, a search of a house without a warrant was held to be unjustified because the arrest had already been made outside the house.

*People* v. *Caffott* (1980) 105 Cal.App.3d 775 [164 Cal.Rptr. 499], cited by counsel during oral argument, is inapplicable. In *Caffott*, a summary of a telephone conversation was presented to a magistrate in support of an application for a search warrant. In fact, a tape recording of the conversation had been made. The court examined whether the summary intruded upon the role of the magistrate which includes drawing significant inferences from the underlying facts.

The belief of the officers that the packaging of controlled substances is usually done by two or more people would not, without more, justify a search for other persons. But Michael's knowledge of appellant's past behavior in harboring a fugitive and possessing a sawed-off shotgun are "specific and articulable facts from which he concluded that his action was necessary." (*People* v. *Block* (1971) 6 Cal.3d 239 at p. 244 [103 Cal.Rptr. 281, 499 P.2d 961].)

Appellant also complains that on one copy of the federal arrest warrant attached to the search warrant "No bail" had been written over "$10,000.00." From this appellant reasons that somebody wrote "No bail" to make him appear to be a dangerous person who would be likely to flee. Homenick recalled that the original warrant did not have a "No bail" notation and that he did not write it. There is no evidence that anyone placed any weight on that notation. Given the known facts of appellant's past, great caution was indicated and properly exercised by the officers.

The judgment is affirmed.

Stephens, Acting P. J., and Ashby, J., concurred.