[L.A. No. 32007. June 16, 1986.]

DANNY JOE TAMBORINO et al., Petitioners, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

**COUNSEL**

Ronald Y. Butler, Public Defender, Frank Scanlon and William J. Kopeny, Assistant Public Defenders, James Dean Allen, Richard Aronson, Donald

J. Aycob and Richard Schwartzberg, Deputy Public Defenders, and Thomas A. Reilly for Petitioners.

No appearance for Respondent.

Cecil Hicks, District Attorney, Michael R. Capizzi, Assistant District Attorney, William W. Bedsworth and Craig McKinnon, Deputy District Attorneys, for Real Party in Interest.

Thomas W. Sneddon, Jr., District Attorney (Santa Barbara), and Gerald McC. Franklin, Senior Deputy District Attorney, as Amici Curiae on behalf of Real Party in Interest.

## OPINION

**LUCAS, J.**—In this case, evidence of a narcotics violation was discovered and seized by a police officer while he was walking through defendants' apartment investigating a robbery report. Defendants unsuccessfully moved to suppress the evidence on the ground that it was seized during an unreasonable, warrantless search of the apartment. As will appear, we hold that the limited "walk-through" search was conducted under exigent circumstances excusing the officer from first obtaining a search warrant.

Defendants Tamborino and Smith are charged with possessing cocaine for the purpose of sale (Health & Saf. Code, § 11351). Asserting that the evidence supporting the charge was unlawfully obtained, defendants moved to suppress that evidence (Pen. Code, § 1538.5, subd. (i)) and to dismiss the information (*id.*, § 995). The trial court, in resolving these motions, considered the transcript of the preliminary hearing and the testimony of one of the arresting officers. The court concluded that the search was lawful and denied defendants' motions. Defendants (petitioners here) seek a writ of mandate to review and set aside those rulings.[1]

I. *The Facts*

On November 12, 1983, Officer Klein, a Newport Beach police officer with four years' experience, received a radio call reporting a robbery at a

---

[1]After we granted a hearing in this case, counsel for defendants moved to dismiss on the ground of mootness, observing that the trial court had dismissed the case in reliance upon the now-vacated Court of Appeal opinion, which had ordered the challenged evidence suppressed. Accepting the People's theory that the trial court had no jurisdiction to dismiss in reliance upon an appellate opinion which was not yet final, we denied defendants' motion.

particular address; a victim was believed to be injured and bleeding. No description was given of either the robber or his victim/victims. Klein and a fellow officer drove to the location and observed some blood spots outside the building and on the walkway outside defendant Tamborino's apartment. A neighbor, Alvino Johnson, confirmed that an injured person was inside the apartment.

Klein knocked on the door to the apartment and loudly identified himself as a police officer. Receiving no response, Klein waited a minute or two and knocked again. The officers heard some sounds of movement inside the apartment. Believing that the situation required prompt action, Klein kicked in the door. He then saw defendant Tamborino in the living room walking toward the front door. He was wearing a bathrobe, was barefoot, and had quite a bit of blood on his head, neck and hands. He was holding his head and seemed to be bleeding from the right side of his face, although not profusely.

Officer Klein testified that at that point he was not sure whether Tamborino was a suspect or a victim and that, for his own safety, he brought Tamborino out of the apartment and handcuffed him. After determining that the wound did not appear serious, Klein immediately reentered the apartment. His main concern was to determine whether there were any other injured persons inside; he did not stop to ask any questions of Tamborino or to "try[] to figure out what had happened at that point."

As he walked through the apartment, Officer Klein observed, in plain view on the living room coffee table, cocaine residue ("a white powdery residue . . . in line forms") and some narcotics paraphernalia. He also noticed some marijuana, a weighing scale and a substance used as a "cutting agent" for cocaine.

Klein brought Tamborino back into the apartment and questioned him. According to Tamborino, his assailant had come to the apartment, asked for Joe (evidently Tamborino's roommate, codefendant Smith), and attacked Tamborino with a knife. (A bloody knife was found on the living room sofa.)

Paramedics were called to attend to Tamborino. Smith arrived soon thereafter, and the officers asked both men to consent to a house search, which was refused. Officer Klein called narcotics officers to the scene to assist in the investigation and he informed Smith that he would be detained while a search warrant was sought. A narcotics officer likewise told Smith that "I was going to petition for a search warrant and was going to call the on-call weekend D.A." Smith thereupon gave his consent to a search "because

[they] were going to find it anyway." The officers soon found several small bindles of cocaine under Smith's mattress. In the meantime, Tamborino had also given his consent to a search after learning that the officers were in the process of obtaining a search warrant.

## II. *Discussion*

Defendants do not challenge the propriety of Klein's action in kicking in their apartment door after receiving no response to his knock. ▉ They do contend, however, that Klein should not have entered after confronting Tamborino because Klein had no articulable reason to believe that additional injured persons (or suspects) remained in the apartment. We reject the argument, believing that under the facts presented here, the trial court could reasonably find that in light of the exigencies of the situation, the officer's limited intrusion into defendants' apartment was justifiable.

▉ We have held that during a lawful search of the premises for suspects, police officers may seize contraband found in plain sight during the search. (*People* v. *Block* (1971) 6 Cal.3d 239, 243 [103 Cal.Rptr. 281, 499 P.2d 961].) In *Block,* we observed that "the reasonableness of an officer's conduct is dependent upon the existence of facts available to him at the moment of the search or seizure which would warrant a man of reasonable caution in the belief that the action taken was appropriate. [Citation.]" (P. 244.) We further explained that in determining whether the officer acted reasonably, "due weight must be given not to his unparticularized suspicions or 'hunches,' but to the reasonable inferences which he is entitled to draw from the facts in the light of his experience; in other words, he must be able to point to specific and articulable facts from which he concluded that his action was necessary. [Citations.]" (*Ibid.*)

▉ Defendants contend that the present search was invalid because Officer Klein could point to no specific or articulable facts indicating that a second victim or suspect might be present in the apartment. But the observation of Tamborino, wounded and bleeding, coupled with the earlier report of a robbery, constituted "articulable facts" that reasonably could have led the officer to decide that an immediate, brief search of the apartment was warranted to determine whether additional persons were present at the crime scene. Officer Klein had no prior information indicating that only *one* victim was involved in the robbery, and in light of the situation he confronted, ordinary, routine common sense and a reasonable concern for human life justified him in conducting a walk-through search truly limited in scope to determining the presence of other victims. Nothing in the record suggests that the officer had any hidden additional motive, such as searching for drugs or contraband, in conducting the search, and the trial court—after

specifically questioning the officer on this point—was satisfied that the officer had no such ulterior motive.

The general principles surrounding warrantless entry were summarized by the United States Supreme Court as follows: "We do not question the right of the police to respond to emergency situations. ▮ Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid. Similarly, when the police come upon the scene of a homicide they may make a prompt warrantless search of the area *to see if there are other victims* or if a killer is still on the premises." (*Mincey* v. *Arizona* (1978) 437 U.S. 385, 392 [57 L.Ed.2d 290, 300, 98 S.Ct. 2408], italics added, fns. omitted.) Although *Mincey* involved the search of a homicide scene, comparable principles would govern a search of the scene of a robbery involving a wounded victim.

The California courts are in full accord with the foregoing emergency exception to the warrant requirement. (See *People* v. *Hill* (1974) 12 Cal.3d 731, 755 [117 Cal.Rptr. 393, 528 P.2d 1] [search for additional wounded persons]; *People* v. *Roberts* (1956) 47 Cal.2d 374, 378 [303 P.2d 721]; *People* v. *Keener* (1983) 148 Cal.App.3d 73, 77 [195 Cal.Rptr. 733]; *People* v. *Dickson* (1983) 144 Cal.App.3d 1046, 1062-1063 [192 Cal.Rptr. 897].)

As an appellate court recently stated, "There is no ready litmus test for determining whether a particular situation negates the constitutional requirement of a warrant. [Citation.] In each case the claim of exigent circumstances must be evaluated on its particular facts. Where there is reasonable cause to believe additional suspects or potential victims are in a residence, a warrantless entry is permissible. [Citations.]" (*People* v. *Keener, supra,* 148 Cal.App.3d 73, 77.) ▮ Under the particular facts of the present case, we conclude that the discovery of one wounded victim afforded reasonable cause to enter and briefly search for additional victims. Although unhurried reflection might have led another officer to conclude that Tamborino should have been questioned before even a superficial search was conducted, Officer Klein could reasonably have concluded that he did not enjoy that luxury, and that immediate action was warranted.[2]

---

[2]As stated in a concurring opinion by now Chief Justice Warren Burger while with the District of Columbia Court of Appeals, "the business of policemen and firemen is *to act,* not to speculate or meditate on whether the report is correct. People could well die in emergencies if the police tried to act with the calm deliberation associated with the judicial process." (*Wayne* v. *United States* (D.C.Cir. 1963) 318 F.2d 205, 212 (conc. opn.).)

Here, two different trial judges (for purposes of defendants' motions under §§ 995 and 1538.5) by necessary implication ruled that Officer Klein reasonably believed that other victims might be present.[3] The finding that the officer indeed entertained such a *subjective* belief was a factual determination which we must accept in light of the substantial evidence supporting it. (See *People* v. *Leyba* (1981) 29 Cal.3d 591, 596-598 [174 Cal.Rptr. 867, 629 P.2d 961].) Although the separate question whether the officer's belief was *objectively* reasonable is a question of law for this court (*id.*, at p. 598), given the exigency presented here and our reluctance to second guess split-second decisions of officers faced with potentially dangerous situations, we conclude that the officer acted reasonably in this case. Contrary to the suggestion of the dissent, our holding does not signal a retreat from past rulings or a departure from established principles.[4] We simply hold that because the officer reasonably could have concluded—on the basis of articulable facts—that he was acting in an emergency situation, his immediate and limited response to the reasonably perceived exigency did not violate constitutional principles.

In view of our conclusion, we do not reach the People's alternative contention that defendants' eventual consent to a search of their apartment cured any illegality arising from the initial entry.

The peremptory writ of mandate is denied.

Mosk, J., Broussard, J., and Reynoso, J., concurred.

---

[3]Although, as the dissent points out, the trial court did find that "Tamborino obviously could not be a suspect because [he] was wearing a robe," the court made no finding as to whether the officer subjectively believed or disbelieved that Tamborino was either a suspect or victim and, of course, the trial court ultimately concluded that the officer reasonably believed that he was faced with an exigent situation and acted properly under the circumstances.

[4]The cases relied on by the dissent are each distinguishable and do not require officers investigating serious offenses to interrogate wounded persons before entering the premises to look for additional victims in all circumstances. In *People* v. *Carney* (1983) 34 Cal.3d 597, 612-613 [194 Cal.Rptr. 500, 668 P.2d 807], the officers were investigating an uncorroborated tip regarding drug activities inside a motor home. No exigent circumstances existed which would justify an immediate entry. In *People* v. *Superior Court (Peck)* (1974) 10 Cal.3d 645, 650-651 [111 Cal.Rptr. 565, 517 P.2d 829], the officers, investigating a possible burglary, interviewed the resident of the subject apartment, who explained that he had lost his key and was required to enter through a window. After the apartment manager confirmed that the suspect was indeed a tenant of the apartment, the officer nonetheless entered and found narcotics. This court properly invalidated the entry. Finally, in *United States* v. *Dugger* (9th Cir. 1979) 603 F.2d 97, 98, the officers were investigating a *fistfight* involving only two men. After interviewing the first victim/participant, they followed a blood trail to the apartment of the second man. The officers confronted and questioned him, but continued to search his apartment "for other occupants." Under these facts, the court properly concluded that the search exceeded the scope of the exigency once the second victim had been found.

**GRODIN, J.**—I agree with the dissent that a police officer who finds a victim at the location of a suspected residential burglary should ordinarily speak with that person before barging into the house on suspicion that there may be another victim within, and that his failure to do so may have an important bearing in assessing the prosecution's claim of exigent circumstances. I do not read the majority opinion as establishing any different proposition.

On the other hand, failure to make inquiry may be reasonable when the risk of delay appears to be substantial, as where human safety is at stake, and where the circumstances are such as to cast doubt upon the reliability of the response. Here, the officer testified that he was uncertain whether Tamborino was a victim or suspect—a circumstance clearly creating doubt as to the reliability of response—and that he was wounded and bleeding, holding his head. Though the trial court commented that Tamborino was "obviously" a victim, because of his attire, that court also found nonetheless that the officer's conduct was reasonable under all the circumstances.

On the peculiar facts of this case, I agree with the trial court, and consequently with the majority. It may be "obvious" in the cool reflection of hindsight that Tamborino was a victim, but the trial court impliedly found that the police officer's contrary view was in good faith and that, under all the circumstances, his actions were reasonable. Given the urgency of the situation as reasonably perceived by the officer, I believe it is appropriate to give him the benefit of the doubt.[1] The event may not have been a pajama party, but then it cannot always be assumed that burglars will come to a burglary properly attired for the task.

**BIRD, C. J.,** Dissenting.—Does a victim of a crime relinquish the privacy of his home merely because he is injured in the course of a crime committed there? The majority say yes. I must respectfully dissent.

---

[1]In the tort arena, "courts have been compelled to recognize that an actor who is confronted with an emergency [i.e., a sudden or unexpected event or combination of circumstances which calls for immediate action] is not to be held to the standard of conduct normally applied to one who is in no such situation. . . . Under [emergency] conditions, the actor cannot reasonably be held to the same accuracy of judgment or conduct as one who has had full opportunity to reflect, even though it later appears that the actor made the wrong decision, one which no reasonable person could possibly have made after due deliberation. The actor's choice 'may be mistaken and yet prudent.' [¶] . . . The conduct required [however] is still that of a reasonable person under the circumstances, as they would appear to one who was using proper care, and the emergency is to be considered only as one of the circumstances. An objective standard must still be applied, and the actor's own judgment or impulse is still not the sole criterion. The actor may still be found to be negligent if, notwithstanding the emergency, his acts are found to be unreasonable. The 'emergency doctrine' is applied only where the situation which arises is sudden and unexpected, and such as to deprive the actor of reasonable opportunity for deliberation and considered decision." (Prosser & Keeton, Torts (5th ed. 1984) § 33, pp. 196-197.)

The majority hold that the presence of an injured victim at the scene of a reported robbery, without more, justifies a sweep search of the robbery victim's dwelling without his consent and without any information as to whether other injured persons are present. The majority do not even require the police to *ask* an otherwise alert and conscious crime victim whether other injured persons are inside before invading the privacy of his home. Such a complete lack of respect for a crime victim's privacy rights cannot be justified by either the "common sense" or the "concern for human life" rationales that my colleagues set forth. (See maj. opn., *ante,* at p. 923.)

In the area of Fourth Amendment guarantees, the courts have a vital obligation in warrantless search cases to ensure that citizens' rights are not unreasonably invaded by police activity. As this court has recognized, " 'We are not dealing with formalities. The presence of a search warrant serves a high function. *Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police.* This was not done to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade [] privacy in order to enforce the law. . . . We cannot be true to that constitutional requirement and excuse the absence of a search warrant without *a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative.*' " (*People* v. *Sirhan* (1972) 7 Cal.3d 710, 738 [102 Cal.Rptr. 385, 497 P.2d 1121], original italics, quoting *McDonald* v. *United States* (1948) 335 U.S. 451, 456 [93 L.Ed. 153, 158, 69 S.Ct. 191], italics added; see also *People* v. *Block* (1971) 6 Cal.3d 239, 244 [103 Cal.Rptr. 281, 499 P.2d 961], citing *Terry* v. *Ohio* (1968) 392 U.S. 1, 21-22 [20 L.Ed.2d 889, 88 S.Ct. 1868].)

"Searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable." (*Mincey* v. *Arizona* (1978) 437 U.S. 385, 390 [57 L.Ed.2d 290, 298, 98 S.Ct. 2408].) Police claiming a search was properly conducted without a warrant "must be able to point to specific and articulable facts from which [they] concluded that [the] action was *necessary.*" (*People* v. *Block, supra,* 6 Cal.3d at p. 244, italics added; *People* v. *Carney* (1983) 34 Cal.3d 597, 611 [194 Cal.Rptr. 500, 668 P.2d 807], revd. on other grounds (1985) 471 U.S. 386 [85 L.Ed.2d 406, 105 S.Ct. 2066].)

Furthermore, in reviewing such searches, one must keep in mind that "[h]omes are afforded the maximum protection from warrantless searches and seizures. [Citations.] The " 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." ' [Citations.]" (*People* v. *Carney, supra,* 34 Cal.3d at p. 607.)

In this case, police were investigating a reported robbery at an apartment complex. The dispatch call indicated that the robbery victim was bleeding and standing on the third floor landing of the apartment building. When the officers arrived on the scene, they saw blood spots directly below the third floor landing and on the landing outside the door of petitioner's apartment.

A neighbor advised the officers that the injured victim was inside the apartment. After knocking and announcing their presence, the officers waited one to two minutes, and, receiving no response, kicked in the door. They then saw petitioner walking barefoot towards the front door. He was bleeding from his head and was clad only in a bathrobe which had blood on it. At this point, Officer Klein was "not sure whether Tamborino was a suspect or a victim . . . ." (Maj. opn., *ante,* at p. 922.)[1]

After confronting petitioner, the police asked him to step outside onto the balcony. He complied and was placed in handcuffs. The police made no attempt to ask him whether other victims were inside. Instead, without petitioner's consent, Officer Klein "sweep searched" the apartment for other victims. Throughout this incident Tamborino remained fully capable of answering any questions the officers might have had about the robbery. Indeed, they learned details about it when they interrogated him—*after* sweep searching the apartment.

The majority attempt to justify the police action in this case under an exception to the warrant requirement first recognized in *People* v. *Roberts* (1956) 47 Cal.2d 374 [303 P.2d 721]. *Roberts* permits authorities to make warrantless searches of premises to the extent *"reasonably necessary* to determine whether a person [is] actually in distress somewhere in the [dwelling]." (*Id.,* at pp. 378-379, italics added.)

*Roberts* is one of the few "specifically established and well-delineated exceptions" (*Katz* v. *United States* (1967) 389 U.S. 347, 357 [19 L.Ed.2d 576, 585, 88 S.Ct. 507]) that the courts have engrafted upon the Fourth Amendment's general proscription against warrantless searches and its counterpart in article I, section 13, of the California Constitution. (*People* v. *Dickson* (1983) 144 Cal.App.3d 1046, 1059-1061 [192 Cal.Rptr. 897].) These exceptions recognize that there may be situations in which compliance with the warrant requirement is impossible or impracticable and in which

---

[1]The majority accept this statement at face value (*ibid.*), despite the trial court's factual finding, based on substantial evidence, that Tamborino simply "could not be a suspect" and that he was instead obviously "an occupant, a victim" of the robbery.

the demands of legitimate law enforcement override an individual's privacy interests.[2]

The *Roberts* exception permits a warrantless search only when it is *"reasonably necessary* to determine whether a person [is] actually in distress somewhere in the [dwelling]." (*Roberts, supra,* 47 Cal.2d at pp. 378-379, italics added.) To validate a search under this exception, the police must show that (1) their perception that an emergency existed was an objectively reasonable one (*id.,* at p. 377) and (2) the action they took in response to that emergency reasonably appeared necessary under the circumstances. (*Id.,* at pp. 378-379; *People* v. *Block, supra,* 6 Cal.3d at pp. 244-245.) This second requirement is nothing more than an application of the general principle that police action taken in response to any emergency must be no more intrusive upon constitutionally protected rights than the emergency requires.

In the instant case, the police action satisfied neither prong of this two-part test. As petitioner concedes, a sufficient emergency existed to justify kicking open the door, but once the officers found Tamborino, any urgent need to search for victims ended. Secondly, even assuming that an emergency continued after the officers observed Tamborino, the sweep search was not "necessary." Petitioner could have provided the police with information about additional victims for whom they claimed they were searching.

When the police encountered Tamborino, he was dressed in a manner which clearly indicated that he was a resident of the dwelling. His injuries signaled that he was a victim of the reported robbery. At this point, "the exigency end[ed], [and] the warrant requirement reemerge[d]." (*People* v. *Keener* (1983) 148 Cal.App.3d 73, 78 [195 Cal.Rptr. 733]; see *People* v. *Frazier* (1977) 71 Cal.App.3d 690, 694 [139 Cal.Rptr. 573].)

The police had absolutely no articulable factual basis for believing that other persons were inside the apartment. The dispatcher's report did not indicate multiple victims. Tamborino's neighbor gave no indication that more than one victim was involved in the robbery. In short, there was nothing more than the ever-present *possibility* that other victims might be present.

---

[2]See *People* v. *Block, supra,* 6 Cal.3d at page 245 (search for other suspects incident to lawful arrest on the premises); *People* v. *Ramey* (1976) 16 Cal.3d 263, 276 [127 Cal.Rptr. 629, 545 P.2d 1333] (warrantless entry of premises to effect an arrest where necessary due to imminent danger to life or property, likelihood of flight or destruction of evidence); *People* v. *Roberts, supra,* 47 Cal.2d at page 378 (search of crime scene necessary to determine presence of and render aid to injured victims); see generally *People* v. *Dickson, supra,* 144 Cal.App.3d at pages 1052-1053 (discussing all three exceptions).

This court has repeatedly held that the "mere possibility" that other persons may be inside a residence is insufficient to justify a warrantless residential search. (*People* v. *Carney, supra,* 34 Cal.3d at p. 612; see *People* v. *Superior Court (Peck)* (1974) 10 Cal.3d 645, 650 [111 Cal.Rptr. 565, 517 P.2d 829]; *Dillon* v. *Superior Court* (1972) 7 Cal.3d 305, 313-314 [102 Cal.Rptr. 161, 497 P.2d 505]; accord, *United States* v. *Dugger* (9th Cir. 1979) 603 F.2d 97, 100, fn. 5.) As this court recognized in *Dillon* in the analogous context of a warrantless search incident to an arrest, "There is, of course, always the possibility that some additional person may be found inside a house outside of which an arrest took place. But the mere possibility of additional persons in the house without more, is not enough to provide probable cause to search the whole premises for additional suspects, once the suspect whom the officers had sought was arrested." (7 Cal.3d at p. 314.)[3]

No different result should obtain when the only apparent crime victim is safely in police custody and no reason for sweeping the residence for additional victims or suspects appears. To sanction sweep searches in such instances justifies police action based on nothing more than "unparticularized suspicions or 'hunches'" (*People* v. *Block, supra,* 6 Cal.3d at p. 244) which, ironically, the majority concede is insufficient. (Maj. opn., *ante,* at p. 923.)

Today's majority in one breath pay lip service to these well established principles, but virtually undermine them in the next. They hold the government no longer need articulate a factual basis for a warrantless residential intrusion. Instead, we are told that "ordinary, routine common sense" and "concern for human life" (maj. opn., *ante,* at p. 923) are adequate justifications for police action even though the record is devoid of such objective factual bases. Now "hunches" or "suspicions" are adequate for such a search, provided the officer takes care to characterize them as an exercise in "routine common sense." The sanctioning of such semantic games seriously undermines formerly inviolable constitutional protections.

The majority's subversion of the rule requiring specific articulable facts in support of exigent circumstances marks the beginning of a new era of warrantless searches in this state. A review of prior state and federal decisions illustrates this point.

In *People* v. *Carney, supra,* 34 Cal.3d 597, the court was faced with a warrantless sweep search of a motor home. The police had commenced

---

[3]A Ninth Circuit panel recently echoed these observations in *United States* v. *Hoffman* (9th Cir. 1979) 607 F.2d 280, 284, noting that "[t]he Government does not satisfy [its] burden by leading a court to speculate about what 'may' or 'might' have been the circumstances surrounding the warrantless search."

surveillance of the appellant's motor home after they received a tip that narcotics dealing was being conducted inside. The officers observed a youth leave the motor home, approached him, confirmed their suspicions, and asked the youth to return to the motor home and ask the appellant to come out. Once this was done, the police arrested the appellant and subsequently searched the trailer.

This court held that the search of the motor home[4] could not be justified under the "protective sweep" doctrine, which permits a search of premises without a warrant for additional subjects under certain limited circumstances. The police had failed to establish that they had a reasonable belief based upon specific, articulable facts that persons other than the accused were inside the motor home. (34 Cal.3d at pp. 612-613.) The court recalled that in *Dillon* v. *Superior Court, supra,* 7 Cal.3d at page 314 "we held that the mere possibility that others might be inside the house based on the fact more than one person lived there was insufficient to support a protective sweep search." (*Carney, supra,* 34 Cal.3d at p. 613.)

The most significant feature of *Carney* is its observation that "[if] the officers had been truly concerned for their safety, it would have been elementary for them to have asked the [informant] who had just left the motor home how many people were inside. . . . This is not to say, of course, that had the [informant] stated defendant was alone, the officers would have been required to trust his response. . . . In any event, any response would simply have been another factor for the officers to consider in determining whether there was reasonable cause under the totality of the circumstances to believe others were inside the motor home." (34 Cal.3d at p. 613 and fn. 9.)

The fact that these factors led the court in *Carney* to reject the government's "protective sweep" justification for its warrantless search illustrates how far today's majority stray from recognized principles governing warrantless searches of dwellings.

In *People* v. *Superior Court (Peck), supra,* 10 Cal.3d 645, police officers responded to a burglary call at an apartment building. A resident of the apartment complex reported seeing a person crawling through the rear window of a neighboring apartment. Arriving at the scene, police went to the

---

[4]*Carney* held that the motor home was a "dwelling" and not subject to the "automobile exception" to the warrant requirement. The United States Supreme Court reversed that portion of our ruling, holding that a motor home with wheels may be treated like an automobile for the purposes of search and seizure principles. (*California* v. *Carney, supra,* 471 U.S. at p. 393 [85 L.Ed.2d at p. 414, 105 S.Ct. at p. 2070].) However, that portion of the ruling dealing with search and seizure principles governing dwellings generally was left intact.

apartment accompanied by the manager of the complex. With pistols drawn, the police knocked on the door and yelled "sheriff's department." Peck opened the door, stepped onto the porch, and stated that he lived there, a fact which the manager confirmed. Peck explained that he was locked out and needed to enter through the window. When the officer asked if he could "take a look," Peck stepped back and the officer entered and found marijuana. (10 Cal.3d at p. 648.) This court unanimously held the search invalid and excluded the evidence. (*Id.*, at pp. 650-651.)

The Attorney General in *Peck* advanced three arguments, similar to those advanced here, to justify the warrantless search. (*Id.*, at p. 650.) First, the state argued, Peck himself might have been the burglar. This court found those suspicions dispelled by the manager's confirmation that Peck lived in the apartment. Next, the Attorney General argued, there may still have been a burglar in the apartment of which Peck was unaware. The court rejected this claim, however, since Peck had explained that *he* was the unidentified man who had entered through the rear window. Finally, the state asserted, a burglar may have been holding Peck hostage. The court rejected this reasoning as well, since Peck's act of stepping out of the apartment indicated that he was free to leave. (*Ibid.*)

If nothing more, *Peck* indicates the importance of an officer making inquiries when he believes there is an urgent need to conduct a warrantless search. Today's ruling teaches that the officer in *Peck* should not have asked questions, since the answers thereto undermined any asserted justifications to search the apartment. Had that officer merely handcuffed the resident, as the police did here, today's majority might have found the search there permissible.

Finally, in *United States* v. *Dugger, supra,* 603 F.2d 97, a case remarkably similar to this one, the Ninth Circuit Court of Appeals invalidated a warrantless search claimed to be justified by exigent circumstances. There, police responded to a report of a fist-fight at an apartment complex. The police arrived about one hour after the fight had ended and interviewed the alleged victim. "The officers then followed a trail of blood leading from [the victim] back to Dugger's apartment, where they observed blood on the front door and keys in the lock. They rang the doorbell 'two or three times,' but heard no response from inside. Then, one of the officers, uninvited, turned the key, pushed the door open, and stepped back away from the open door. The officers then called to Dugger and identified themselves as being from the sheriff's department. They heard no immediate response. Then, a male within the apartment called out that he was putting on his shoes and would be right out." (603 F.2d at p. 98.)

"Upon entering Dugger's apartment, the officers walked through the darkened living room to the lighted rear bedroom of the dwelling. There they found the defendant putting on his shoes. While one of the officers questioned Dugger, his companion quickly searched the rest of the apartment for other occupants. Then the officers asked Dugger to go with them into the living room. While looking for the light switch in the living room by flashlight, the officers observed what appeared to be marijuana strewn over the living room floor." (*Ibid.*)

The district court had justified the warrantless entry on grounds of exigent circumstances and "the need to determine if anyone needed immediate medical attention." (*Ibid.*) The court of appeals rejected that reasoning under the "clearly erroneous" standard of review. (603 F.2d at pp. 99-100.) The court reasoned that " 'the scope of the warrantless search must be commensurate with the rationale that excepts the search from the warrant requirement.' " (603 F.2d at p. 99, quoting *Cupp* v. *Murphy* (1973) 412 U.S. 291, 295 [36 L.Ed.2d 900, 905, 906, 93 S.Ct. 2000].) "[O]nce the officers heard Dugger respond from within that he was coming outside as soon as he put on his shoes, any excuse of an emergency dissipated." (*Dugger, supra,* at pp. 99-100.)[5]

The similarities between *Dugger* and the instant case are too obvious to belabor. There, as here, the police were presented with no indication that other persons were in the dwelling. The Ninth Circuit was simply unwilling to uphold that search merely based on "conjecture." (*Id.,* at p. 100, fn. 5.) Today's majority depart from this logical view and hold that such conjecture *is* a proper basis for upholding a search, provided it is couched in terms of "routine common sense."[6]

---

[5]The majority's reading of *Dugger* is seriously flawed. (See maj. opn., *ante,* at p. 925, fn. 4.) The majority imply that *Dugger* found unlawful only that part of the search which occurred *after* the police had questioned Dugger. (*Ibid.*) In fact, the court ruled that the *initial entry* of the premises was unlawful since any exigency ended at the moment the officers heard Dugger say he was putting on his shoes and "would be right out." (*Dugger, supra,* 603 F.2d at pp. 99-100.) While it is true that the police questioned Dugger *after* they unlawfully entered (*id.,* at p. 98), that fact was irrelevant to the court's ruling. (See *id.,* at pp. 99-100.)

[6]Another case with similar facts is *United States* v. *Spetz* (9th Cir. 1983) 721 F.2d 1457. There, Drug Enforcement Administration agents arrested five suspects in the driveway of a residence and subsequently conducted a sweep search of the residence, on the asserted ground that other suspects might, in the district court's words, "be disposed to draw a bead on [the officers]." (*Id.,* at p. 1467.)

Finding such reasoning speculative and noting that there was not even the "slightest indication that the suspects arrested in the driveway were armed or that there were weapons within the house" (*ibid.*), the court held the search unlawful. The court also observed that "[t]here were no known confederates of the individuals arrested; . . . the agents were able to observe that all of the doors were open and presumably could keep the means of egress under surveillance[, and] the agents knew of no weapons connected with any of the individ-

Even assuming that the officers might have had an articulable basis for believing that other persons were present, a sweep search went far beyond action which was "necessary" to deal with that supposed exigency. Again, the cases are illustrative.

Settled principles of law in this area, emanating from two lines of cases, have established the ways in which a sweep search may be "necessary" in a *Roberts*-type situation. The first line of cases involves situations in which police arrive at a crime scene and suspect that injured victims are inside but no one is present to give such information. (*People* v. *Hill* (1974) 12 Cal.3d 731, 755 [117 Cal.Rptr. 393, 528 P.2d 1]; *People* v. *Roberts, supra,* at pp. 378-379; compare *United States* v. *Dugger, supra,* 603 F.2d at p. 100, fn. 5.) In these cases, courts have upheld limited searches for victims within the premises on the ground that such searches were "the only practical means of determining whether there was anyone inside in need of assistance." (*Hill, supra,* 12 Cal.3d at p. 755.)

The second group of cases involves sweep searches for victims where the only available information about the incident would come from a suspect. In these cases, the search was justified by the fact that the suspect could not reasonably have been expected to give an honest response to police inquiries. (See, e.g., *People* v. *Block, supra,* 6 Cal.3d 239; *People* v. *Keener, supra,* 148 Cal.App.3d at p. 76; cf. *People* v. *Carney, supra,* 34 Cal.3d at p. 613.)[7]

The present case falls within neither of the two lines of authority noted above. Employing the *Hill* rationale, Officer Klein was not faced with a

---

uals arrested or the residence, nor had they any other articulable basis for a conclusion that a potential for violence existed." (*Ibid.*)

The court found, however, that the taint from that action was attenuated by a subsequently obtained search warrant, and eventually affirmed the convictions. (*Id.,* at pp. 1468, 1478.)

[7]The reason for these limited inroads into the Fourth Amendment is plainly stated in *People* v. *Dickson, supra,* 144 Cal.App.3d at page 1063: "The risk 'exigent circumstances' will be used as a pretext is especially grave when officers have some suspicion, short of probable cause, that criminal activity is under way on the premises they intend to invade. This is not to say an officer's motives must be completely pure when he enters with the avowed purpose of protecting life and property. Clearly when an officer hears gunfire and screams of pain inside a house he may rush in with an investigator's curiosity as well as the savior's desire to save lives. But where mixed motives are possible the courts must be alert the savior's image is not merely pretence for an unconstitutional invasion of a suspect's private home.

"Without entering the policeman's head, we can never be certain whether he was thinking as a savior or an investigator. However, where . . . the 'exigent circumstances' rest on a claimed imminent threat of danger to life and property, . . . the court is entitled to ask at least two questions. First, . . . was the threat so imminent and serious a reasonable policeman would believe that a warrantless, emergency entry was necessary to save lives and property? And, second, . . . was this officer indeed motivated primarily by a desire to save lives and property?"

situation where his only means of determining the presence of others was to search the apartment. Though injured, petitioner was alert and ambulatory. Therefore, he was fully capable of answering any questions the police may have had.

As to the *Block* rationale, the trial court found that Tamborino simply "could not be a suspect" since he was obviously an occupant of the apartment and a victim of the robbery. It is not surprising that this critical factual finding is ignored in an attempt to justify the trial court's ultimate ruling.

The majority hold that when an officer believes that an "emergency" exists, the courts should be reluctant to question whether he or she acted "reasonably" with regard to protected Fourth Amendment rights. Apparently the officer need not confine his or her conduct to that which is "necessary" to preserve and protect life. (See maj. opn., *ante,* at p. 924 & fn. 2.)

As the above-cited cases illustrate, every court which has permitted "emergency" sweep searches for injured persons or suspects—including those cited by the majority—has required to date a particularized showing that the police action was reasonably necessary in light of the circumstances. The majority's "reluctance to second guess split-second decisions of officers faced with potentially dangerous situations" (maj. opn., *ante,* at p. 925) seemingly abandons any requirement that the police make the "reasonably necessary" showing. Under the majority's holding, whenever an officer perceives an "emergency," the courts will not question his or her actions.

In addition, the majority's holding is not mandated by "routine common sense" or a "concern for human life"—the justifications my brethren assert for the warrantless intrusion. Existing exceptions to the warrant requirement already accommodate such reasoning.

The law in this area represents a delicate but necessary balance between the legitimate needs of law enforcement and a person's reasonable expectation of privacy. That balance is preserved by excusing Fourth Amendment compliance in *Roberts* situations only when "reasonably necessary." Today's majority upset that balance, undermining the Constitution in the process. Henceforth, in order to escape the Constitution's warrant requirement, an officer need merely claim that the crime victim appeared to be a suspect—no matter how unreasonable that contention—and cite the ever-present possibility of additional individuals inside the dwelling.

In sum, my colleagues dilute the protection of the reasonableness standard in order to accommodate a weak factual showing of necessity in this partic-

ular case. In so doing, they undermine Fourth Amendment principles and depart from existing law. Such a holding cannot be justified by either "routine common sense" or a "concern for human life." Existing principles have served society well in the difficult task of balancing constitutionally protected privacy rights against the need to preserve human life in emergency situations. I see absolutely no reason to subvert these carefully developed principles and curtail the constitutional rights of victims of crime.