Filed 12/19/14  P. v. Daugherty CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>DANNY ALAN DAUGHERTY,<br><br>  Defendant and Appellant. | G048642<br><br>(Super. Ct. No. 12NF2594)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Ronald E. Klar, Temporary Judge (pursuant to Cal. Const., art. VI, § 21), James Edward Rogan and Richard M. King, Judges.  Affirmed.

William G. Holzer, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., Raquel M. Gonzalez, and Doyle Martin, Deputy Attorneys General, for Plaintiff and Respondent.

Danny Alan Daugherty appeals from a judgment after a jury convicted him of possession of marijuana for sale. Daugherty argues the trial court erred in denying his motion to suppress evidence. We disagree and affirm the judgment.

FACTS

Loren Rofe, a United States postal inspector, discovered a suspicious package and went to the addressee's residence with another inspector. Rofe knocked on the door. When Daugherty opened the door, Rofe smelled marijuana and saw a young girl, Daugherty's daughter, sitting in the background. Rofe identified himself and asked Daugherty if he was expecting a package. He confirmed he was in a nervous manner. In response to questions, Daugherty told Rofe that he had marijuana but not a medical marijuana card. Rofe asked to come inside, and Daugherty refused and said he needed a warrant. Rofe said he was detaining Daugherty and securing the apartment. Daugherty slammed the door, and Rofe heard him run. Rofe called the police and went to the manager's office to get a key.

When officers arrived about 15 minutes later, Rofe knocked, and when Daugherty did not open the door, Rofe used the key to open the door. Daugherty came out, and the inspector went inside and brought his daughter outside. Rofe went back inside to conduct a "protective sweep" and he saw a jar of marijuana and safe inside the master bedroom closet. Officers obtained a search warrant and found marijuana, a digital scale, packing materials, a gun, and a lot of cash in small denominations.

A complaint charged Daugherty with possession of marijuana for sale (Health & Saf. Code, § 11359). Daugherty filed a motion to quash/traverse the search warrant and to suppress evidence pursuant to Penal Code section 1538.5. In his motion to suppress, Daugherty argues officers did not have a search warrant and the protective sweep, exigent circumstances, and emergency aid exceptions were inapplicable.

At the outset of the hearing on the motions, Commissioner Ronald E. Klar inquired whether the parties stipulated there was no arrest warrant or search warrant. The

prosecutor answered, "With regards to the protective sweep, which I believe is at issue, there was no warrant for that, your honor, and we will stipulate to that."

Rofe testified his primary responsibility was to investigate crimes involving United States mail. Rofe testified to the following. One morning he inspected a package that felt like it had been vacuum sealed, which helps prevent a drug canine from detecting drug odor. The package was flat and felt like three stacks of United States currency that had been vacuum sealed. The return address was for an "Elizabeth Villegas" and it was addressed to Daugherty at 1401 South Harbor Boulevard in La Habra. He conducted a records check, and the sender's return address did not match the sender's most current address on record. Additionally, the sender paid with cash and the signature waiver was signed, which is unusual for express mail.

Rofe and Inspector Bob Draper went to 1401 South Harbor Boulevard and knocked on the door. When a man opened the door, Rofe was overwhelmed with the smell of marijuana. Rofe identified himself and asked the man if he was "Danny Daugherty," which he said he was. Rofe saw a girl, "seven to nine years old," sitting at the dining room table. Rofe asked Daugherty if he was expecting an express mail package and he "nervous[ly]" said he was. Rofe asked him if he knew who sent him the package, and he said, "Liz," but he did not provide Rofe with her last name. When Rofe asked Daugherty if he knew what was inside the package, he first said he did not know and then stated, "'I plead the Fifth.'" Rofe asked if he had any marijuana inside the house, and Daugherty said he had a jar of marijuana but did not have a medical marijuana card. Based on his training and experience, the overwhelming smell of marijuana caused Rofe to believe Daugherty might be cultivating marijuana. Rofe asked if he could go into Daugherty's residence and whether he had a large amount of marijuana inside. Daugherty said, "No," and he needed a warrant. Rofe said he was detaining Daugherty and was going to secure the residence. Daugherty slammed the door and Rofe heard him run away from the door.

3

Rofe was concerned for the child's safety and the destruction of evidence. Rofe was concerned for the child's safety because cultivation operations involve electrical wiring, chemicals, heating elements, and pesticides. Based on the overwhelming smell of marijuana and Daugherty slamming the door and running, Rofe believed Daugherty was going to destroy evidence.

Rofe called the La Habra Police Department and obtained a key to the apartment from the management office. While Rofe waited for officers near the front of Daugherty's apartment, Draper first made sure there were no other exits and then returned to Daugherty's front door. When officers arrived, Rofe briefed them and knocked on the door and asked Daugherty to come outside. When he refused, Rofe used the key to open the front door. Daugherty came outside, and Rofe brought the girl outside. Rofe went back inside for a couple minutes "[t]o make sure that there was no one else in the residence that could do harm to [them][]" and "to make sure there were no other people in the residence." Rofe saw a safe and a jar of marijuana in the master bedroom closet. They identified the girl as Daugherty's daughter and called her mother, who picked her up.

On cross-examination, Rofe testified it was between five and 10 minutes from when he called the police to when he went to the manager's office to get the key. He added it was 10 to 15 minutes from when he called police until they arrived. Rofe admitted he did not see any electrical wiring, chemicals, pesticides, or heating devices when Rofe opened the door; his suspicions were based solely on the smell of marijuana.

At the outset, Commissioner Klar stated the issue was whether Rofe's entry into the residence was justified and if it was, the protective sweep was justified because it was "subsumed by that." After discussing protective sweep case law, and stating it had reviewed exigent circumstance case law, the court commented on the facts before it. The court stated there was no evidence "even remotely indicating there is anyone else in the residence or any danger in the residence from a person or people, more than one person

4

involved, nothing[]" supporting the protective sweep exception. The court also stated there was no evidence Daugherty was trying to destroy evidence. The court characterized the assertion Daugherty was cultivating marijuana as "guess[work]" and "pure speculation." The court stated the issue turned on whether the fact a nine-year-old girl was sitting in a residence where Daugherty had marijuana justified officers entering without a search warrant based on exigent circumstances. The court added the issue was "more interesting" because of the 10 to 15 minute delay from the time Rofe called the police until they entered the residence. The court stated it had "serious disagreements with [Rofe's] speculation . . . but not his veracity[]" and the court was "smart enough to know why they wanted in there." The court opined it was "a very close call" but the court denied the suppression motion because the entry was "*justified on the safety of the child issue*." (Italics added.)

At the preliminary hearing, Detective James Verner testified concerning what happened after Rofe entered the residence and conducted the "protective sweep." Verner stated he obtained a search warrant. In the master bedroom closet, officers found glass jars and plastic bags containing marijuana and a bucket containing marijuana residue. Verner stated the weight of the jars and the marijuana was one to two pounds. Officers found a digital scale in Daugherty's dresser. Officers found marijuana residue in the bathroom. Officers also found a vacuum sealer, a handgun, and $900 in small denominations throughout the apartment. Verner opined Daugherty possessed the marijuana for sale. He also stated Rofe opened the package and found $8,000 to $9,000. Daugherty was held to answer.

An information charged Daugherty with possession of marijuana for sale (Health & Saf. Code, § 11359). Daugherty filed a motion to dismiss pursuant to Penal Code section 995 and another motion to quash/traverse the search warrant and to suppress evidence pursuant to Penal Code section 1538.5. The prosecutor opposed the

5

motions. After reviewing the written submissions and hearing argument, Judge James Edward Rogan denied the motions.[1]

After trial presided over by Judge Richard M. King, the jury convicted Daugherty of count 1. The trial court suspended sentence, placed Daugherty on formal probation for three years, and ordered him to serve 120 days in jail.

## DISCUSSION

Daugherty argues the trial court erred in denying his motion to suppress because neither Rofe's initial entry nor his subsequent reentry were lawful under the imminent destruction of evidence exception, the emergency aid exception, or the protective sweep exception to the warrant requirement. The Attorney General contends Rofe's initial entry was justified to provide aid to the child and preserve evidence but the Attorney General does not expressly address the lawfulness of Rofe's reentry into the residence. As we explain below, we conclude Rofe was justified in entering and reentering the residence to provide aid to the child and ensure there were no other children in the residence.

*Standard of Review*

"'An appellate court's review of a trial court's ruling on a motion to suppress is governed by well-settled principles. [Citations.] [¶] In ruling on such a motion, the trial court (1) finds the historical facts, (2) selects the applicable rule of law, and (3) applies the latter to the former to determine whether the rule of law as applied to the established facts is or is not violated. [Citations.] "The [trial] court's resolution of each of these inquiries is, of course, subject to appellate review." [Citations.] [¶] The court's resolution of the first inquiry, which involves questions of fact, is reviewed under the deferential substantial-evidence standard. [Citations.] Its decision on the second, which is a pure question of law, is scrutinized under the standard of independent review.

---

[1] The record is silent as to the reasons Judge Rogan denied the motions.

6

[Citations.]  Finally, its ruling on the third, which is a mixed fact-law question that is however predominantly one of law, . . . is also subject to independent review.'  [Citations.]  All presumptions favor the trial court's exercise of its power to judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence, and draw factual inferences, "'and the trial court's findings on such matters, whether express or implied, must be upheld if they are supported by substantial evidence.'"  [Citations.]  And where, as is the case here, there is no controversy concerning the underlying facts, our task is simplified:  The only issue is whether that rule of law, as applied to the undisputed historical facts, was or was not violated.  This is an issue for our independent review.  [Citation.]  [¶]  Based upon its factual findings, the trial court has the duty to determine whether 'the search was unreasonable within the meaning of the Constitution.'  [Citation.]  California courts measure the reasonableness of the search against federal constitutional standards.  [Citations.]" (*People v. Werner* (2012) 207 Cal.App.4th 1195, 1203-1204.)

*Legal Principles*

"It is a '"basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable."'  [Citations.]  Nevertheless, because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions.  [Citations.]  We have held, for example, that law enforcement officers may make a warrantless entry onto private property to fight a fire and investigate its cause, [citation], to prevent the imminent destruction of evidence, [citation], or to engage in '"hot pursuit"' of a fleeing suspect, [citation].  '[W]arrants are generally required to search a person's home or his person unless "the exigencies of the situation" make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment.'  [Citation.]  [¶]  One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury.  '"The

7

need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.'" [Citations.] Accordingly, law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury. [Citations.] [¶] . . . [¶] An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed objectively, justify [the] action.' [Citation.] The officer's subjective motivation is irrelevant. [Citations.]" (*Brigham City, Utah v. Stuart* (2006) 547 U.S. 398, 403-404 (*Brigham*).)[2]

"Officers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception." (*Michigan v. Fisher* (2009) 558 U.S. 45, 49 (*Fisher*); *People v. Troyer* (2011) 51 Cal.4th 599, 602 (*Troyer*).) "'[A]n objectively reasonable basis for believing' that medical assistance was needed, or persons were in danger" suffices. (*Fisher, supra,* 558 U.S. at p. 49; *Troyer, supra,* 51 Cal.4th at p. 605 [each case of emergency aid measured by facts known to officers].) "Where police officers reasonably believe warrantless entry of a residence is necessary to prevent imminent danger to a child, the entry is justified by exigent circumstances. (*People v. Lucero* (1988) 44 Cal.3d 1006, 1017 . . . .)" (*People v. Neighbours* (1990) 223 Cal.App.3d 1115, 1122 (*Neighbours*).) *Troyer, supra,* 51 Cal.4th 599, is instructive.

In *Troyer, supra,* 51 Cal.4th at page 603, officers responded to an emergency call that an unidentified male had possibly been shot twice. When they arrived, officers "approached the front porch of the residence, where a 40-year-old White

---

2     In *People v. Ray* (1999) 21 Cal.4th 464, 470-477, a plurality applied the community caretaking exception and its subcategory the emergency aid exception to the search warrant requirement to residences. The *Brigham* court addressed the emergency aid exception as an exigent circumstance. (*Brigham, supra,* 547 U.S. at p. 403.) The court in *People v. Madrid* (2008) 168 Cal.App.4th 1050, 1057, footnote 4, explained one commentator opined *Brigham* effectively collapsed any distinction between the emergency aid doctrine and the exigent circumstances exception to the warrant requirement.

male was administering first aid to a female victim . . . who had been shot multiple times." (*Ibid*.) They also encountered a male victim who was bleeding from his head, had blood on his shirt, and was visibly agitated. (*Ibid*.) The male victim told an officer that two males were responsible for the shooting and had fled in a vehicle. (*Ibid*.) An officer noted blood marks on the front door of the house, including the area near the handle. (*Ibid*.) The officer asked the male victim if there was someone in the house several times, but his answers were delayed and inconsistent. (*Ibid*.) The officer described the situation as chaotic—the female victim was screaming and the male victim was visibly agitated. (*Ibid*.) Because the officer could not determine whether there were any sounds coming from inside the home, "[the officer] decided that he had a responsibility to verify whether there were additional victims or suspects in the house." (*Id*. at pp. 603-604.) As a result, the officer went into the house and found contraband in a locked room. (*Id*. at p. 604.)

The *Troyer* court held the officers had a reasonable belief that "one or more shooting victims could be inside the house." (*Troyer, supra,* 51 Cal.4th at p. 607.) The court relied on the following facts: there was bloodstain evidence on the door, the dispatch report indicated a male had possibly been shot twice, it was unclear whether the male victim was in fact the man who had been shot, and the male victim gave delayed and inconsistent answers to the officer. (*Id*. at pp. 608-609.)

In reaching its conclusion, the *Troyer* court relied on *Tamborino v. Superior Court* (1986) 41 Cal.3d 919 (*Tamborino*). In that case, police responded to a report of a robbery and a neighbor confirmed that an injured person was inside the apartment. When the officer did not receive a response to his knock and announce, the officer kicked down the door and found petitioner, who was bleeding from the head. (*Id*. at p. 922.) The officer brought petitioner out of the apartment and handcuffed him. Because the officer was unsure whether petitioner was a victim or the suspect, the officer immediately reentered the apartment, without asking petitioner any questions, because he

9

was concerned there might be another injured person inside. Inside, the officer found cocaine residue, marijuana, and narcotics paraphernalia in plain view. (*Ibid*.)

The *Troyer* court stated that in *Tamborino* it "explained that 'the observation of [petitioner], wounded and bleeding, coupled with the earlier report of a robbery, constituted "articulable facts" that reasonably could have led the officer to decide that an immediate, brief search of the apartment was warranted to determine whether additional persons were present at the crime scene. [The officer] had no prior information indicating that only *one* victim was involved in the robbery, and in light of the situation he confronted, ordinary, routine common sense and a reasonable concern for human life justified him in conducting a walk-through search truly limited in scope to determining the presence of other victims.'" (*Troyer, supra,* 51 Cal.4th at pp. 609; *Tamborino, supra,* 41 Cal.3d at p. 923.) The *Troyer* court concluded, "Under these circumstances, and inasmuch as [the officer] did not know who lived at the residence or who had been the aggressor, an objectively reasonable basis existed to enter the residence to search for additional victims." (*Troyer, supra,* 51 Cal.4th at pp. 608-609.)

Here, Rofe's testimony showed that before he entered Daugherty's residence, he had identified a suspicious package addressed to Daugherty. Based on his inspection, Rofe believed the contents of the package had been vacuum sealed and that the package contained three stacks of United States currency. Rofe knew, based on his experience, drug proceeds were vacuum sealed to mask drug odors. Rofe's records check revealed the return address was invalid, and the sender took other steps to minimize the risk of detection, including paying with cash and waiving the requirement the recipient sign for the package.

When Rofe arrived at the residence and Daugherty opened the door, Rofe was overwhelmed with the smell of marijuana and saw a young girl sitting at a table. After Daugherty nervously told Rofe he was expecting a package, and he provided other evasive answers to Rofe's questions, Daugherty "'plead[ed] the Fifth.'" Daugherty

10

admitted to Rofe both that he had marijuana in the house and that he did not have a medical marijuana card. Based on his belief the package contained currency and the overwhelming smell of marijuana, Rofe concluded Daugherty might be cultivating marijuana, which posed a danger to the young girl. When Rofe told him that he was detaining Daugherty and securing the residence, Daugherty refused Rofe's request to enter the residence, slammed the door, and ran away. After Rofe obtained the key to the residence, officers arrived, and Daugherty refused to open the door, Rofe used the key to open the door and Daugherty exited the residence. Rofe entered the residence and brought the young girl outside. Rofe went back inside for a couple minutes "[t]o make sure that there was no one else in the residence that could do harm to [them][]" and "to make sure there were no other people in the residence." Rofe saw a safe and a jar of marijuana in the master bedroom closet and officers obtained a search warrant.

Based on a totality of the circumstances, Rofe was justified in entering the residence to escort Daugherty's daughter out of the residence. It is true the trial court concluded the record was void of any visible evidence of cultivation, but the facts established Rofe believed Daugherty was receiving a large amount of cash, he was overwhelmed with the smell of marijuana when Daugherty opened the door, Rofe knew Daugherty possessed marijuana based on his admission, and Rofe believed Daugherty could be growing marijuana. These facts would alert a person in Rofe's position to reasonably conclude the child's safety was of paramount concern and she should immediately be removed from the premises. It is true the young girl sat at a table, apparently displaying no sense of distress. But as is often the case, children are unaware of the dangers surrounding them only realizing them when it is too late. And although Rofe waited 10 to 15 minutes before entering the residence, Rofe and Draper surveilled the apartment to ensure Daugherty did not leave and the premises was secure. Thus, Rofe was justified in entering the residence to secure the young girl's safety. (*Neighbours, supra,* 223 Cal.App.3d at pp. 1122-1123.)

11

The closer question is whether Rofe was justified in reentering the residence. Based on *Troyer* and *Tamborino*, we conclude he was. Again, the facts known to Rofe justified his entrance into the residence to secure Daugherty's daughter's safety. The facts known to Rofe also justified reentry to ensure there were no other people, particularly children, in the residence. Rofe had no information there were other children in the residence but common sense dictated he was justified in conducting a brief walk-through search to determine the presence of other children and ensure their safety. (*Troyer, supra,* 51 Cal.4th at pp. 608-609; *Tamborino, supra,* 41 Cal.3d at p. 923.)

Daugherty asserts Rofe was not justified in entering the residence because Rofe's intent was to investigate a crime. As stated in *Brigham, supra,* 547 U.S. at page 404, "The officer's subjective motivation is irrelevant." Therefore, Rofe's entry and reentry into Daugherty's residence did not violate the Fourth Amendment.

DISPOSITION

The judgment is affirmed.

O'LEARY, P. J.

WE CONCUR:

ARONSON, J.

FYBEL, J.

12