TUCHER, J., Dissenting.
If a man lives in a high crime neighborhood and somebody discharges a firearm outside his home, may the police break down his door and enter his apartment when he refuses to invite them in to investigate? The majority seems to think so, but the Fourth Amendment answers a resounding "no"-at least not without circumstances, not present here, that would cause a reasonable person to believe that someone in the apartment stood in need of aid, or that some other exception to the warrant requirement applied.
The Fourth Amendment draws a " 'firm line at the entrance of the house.' " ( People v. Bennett (1998) 17 Cal.4th 373, 386, 70 Cal.Rptr.2d 850, 949 P.2d 947, citing Payton v. New York (1980) 445 U.S. 573, 590, 100 S.Ct. 1371, 63 L.Ed.2d 639.) At the amendment's "very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." ( Silverman v. United States (1961) 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734.) Thus, "[w]ith few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no." ( Kyllo v. United States (2001) 533 U.S. 27, 31, 121 S.Ct. 2038, 150 L.Ed.2d 94 ( Kyllo ).)
The Attorney General urges two exceptions to the Fourth Amendment's warrant requirement as justifying the warrantless intrusion in this case, but he is wrong on both counts. The emergency aid exception of People v. Ray (1999) 21 Cal.4th 464, 88 Cal.Rptr.2d 1, 981 P.2d 928 ( Ray ) does not apply because the police had no reasonable basis to conclude there was anybody inside the apartment who was in danger or distress. And the exigent circumstances exception fails independently to justify the forced entry because there was no probable cause to believe that a shooting suspect was in the apartment.
I. Emergency Aid Doctrine
The emergency aid exception to the warrant requirement allows police to "enter a home without a warrant when they have an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury." ( Brigham City v. Stuart (2006) 547 U.S. 398, 400, 126 S.Ct. 1943, 164 L.Ed.2d 650 ( Brigham City ); accord People v. Troyer (2011) 51 Cal.4th 599, 606, 120 Cal.Rptr.3d 770, 246 P.3d 901 ( Troyer ).) In determining *40 whether an officer acted reasonably, " 'due weight must be given not to his unparticularized suspicions or " 'hunches,' " but to the reasonable inferences which he is entitled to draw from the facts in light of his experience; in other words, he must be able to point to specific and articulable facts from which he concluded that his action was necessary.' " ( People v. Duncan (1986) 42 Cal.3d 91, 97-98, 227 Cal.Rptr. 654, 720 P.2d 2 ( Duncan ); accord Terry v. Ohio (1968) 392 U.S. 1, 23, 88 S.Ct. 1868, 20 L.Ed.2d 889.)
Missing in this case are specific and articulable facts that would lead a reasonable person to conclude shots fired outside defendant's garage apartment required breaking down the door to rescue someone inside his home. ShotSpotter data and percipient witness observations placed all of the gunfire outside the home, in or near the driveway and the gate to the backyard. There were no bullet holes in windows or siding to suggest that any of the shots fired outside the home had penetrated into the garage. There were no drops of blood on the ground to suggest anybody in range of the gunshots had been hit. Police talked to eyewitnesses but heard no reports of a scuffle, or of any other sounds or sights suggesting anyone had been threatened or injured. When police asked Francisco Rubio, Sr. if anyone had been shot, he responded "I don't think so." (Any lack of definitiveness in this answer is easily explained by the fact that he had been asleep until awoken by the sound of gunfire; getting out of bed to investigate, he saw nobody.)
Other than the simple fact that shots were fired outside defendant's home, the Attorney General points only to the ample evidence that two people in this high-crime neighborhood distrusted the police. First, the response to Sergeant Simmont's pounding on the outside door of defendant's apartment, announcing police presence, was an evident attempt to barricade the door from the inside. Then, a man who did not live at the house and who had a habit of "making his dissatisfaction [with] the police known" emerged from the backyard in a belligerent manner. Finally, defendant responded to the continued police attempts to gain access to his apartment by coming out into the kitchen with his hands in his pockets, daring the police in a loud voice to shoot him.
These facts certainly justify the police in detaining defendant and Joshua Bazan in handcuffs while they continue their investigation, but they do not support an inference that an injured person remains in the garage. Bazan had no reported link to the home, so his presence outside it says nothing about what is happening inside. Is Bazan a friend or foe of the inhabitants? Is he responsible for the shots fired? At this point, the police did not know. They did know, or at least had strong evidence to suggest, that the only reported occupant of the garage wanted no contact with them, and that he feared police would break down his door and would shoot him. But defendant's evident distrust of police and preference to avoid interacting with them does not plausibly support an inference that somebody else was in his apartment and suffering from a gunshot wound. Even after they detained Bazan and defendant, the police learned nothing to substantiate their original suspicion that an injured person might be in the garage. And with nothing more than an "unparticularized suspicion[ ]" that emergency aid might be necessary, the police may not breach the firm line the Fourth Amendment draws at the entrance to defendant's home. ( Duncan , supra , 42 Cal.3d at pp. 97-98, 227 Cal.Rptr. 654, 720 P.2d 2.) They cannot break down his door simply because Sergeant Simmont "didn't have anything to *41 rule ... out" the possibility that someone inside had been shot.
Unlike the majority, I find no authority in Ray, supra , 21 Cal.4th 464, 88 Cal.Rptr.2d 1, 981 P.2d 928, for the forced entry into defendant's apartment. In fact, a majority of justices in Ray conclude that the emergency aid doctrine did not even justify the warrantless entry into an empty apartment in that case. The first portion of the lead opinion "agree[s] with defendant that the People did not meet their burden of establishing circumstances warranting the officers' actions under the emergency aid component of community caretaking." ( Id. at p. 472, 88 Cal.Rptr.2d 1, 981 P.2d 928 (lead opn.).) Three justices conclude in the lead opinion that, although "[t]he officers were concerned for the possibility of an injured person inside the residence," they "had no knowledge of any facts that would lead a reasonable person in their position to believe entry was immediately necessary to aid life or limb." ( Id. at p. 473, 88 Cal.Rptr.2d 1, 981 P.2d 928 (lead opn.).) Joining them on this point was Justice Mosk, whose dissent found no justification for the warrantless search in Ray at all. (I d. at p. 482, 88 Cal.Rptr.2d 1, 981 P.2d 928 (dis. opn. of Mosk, J.).) Thus, to the extent our case is analogous-and on this point I think it is- Ray precludes us from applying the emergency aid doctrine here. As in Ray , so in this case, officers may have been "concerned for the possibility of an injured person" ( id. at 473, 88 Cal.Rptr.2d 1, 981 P.2d 928 (lead opn.)), but without specific and articulable facts to support an inference that an injured person might be inside the apartment, the emergency aid exception does not authorize warrantless entry.
After rejecting the emergency aid doctrine as grounds for police entry into the apparently burglarized apartment in Ray , the lead opinion goes on to endorse warrantless entry on a different theory. The opinion accepts the prosecution's argument that there is a non-emergency variant of the community caretaking exception, and that this broader conception of community caretaking excuses the police from having obtained a warrant. ( Ray, supra , 21 Cal.4th at p. 473, 88 Cal.Rptr.2d 1, 981 P.2d 928 (lead opn.).) "[C]ircumstances short of a perceived emergency may justify a warrantless entry," such as " 'where the police reasonably believe that the premises have recently been or are being burglarized,' " the three justices conclude. ( Ibid. ) On this second holding, Justice Mosk parts company with the lead opinion, rejecting the idea "that the warrantless search of a residence, under nonexigent circumstances, can be justified on the paternalistic premise that 'We're from the government and we're here to help you.' " ( Id. at p. 482, 88 Cal.Rptr.2d 1, 981 P.2d 928 (dis. opn. of Mosk, J.).)
Not only does the Ray lead opinion's second theory fail to command a majority, it has no application to the facts of defendant's case. Here, nobody argues that circumstances short of an emergency required police attention. Sergeant Simmont was not, for example, trying to protect defendant's property from potential burglars. Moreover, the lead opinion in Ray teaches that the community caretaking exception only justifies intrusions for purposes other than emergency aid if the police are not investigating a crime. "Any intention of engaging in crime-solving activities will defeat the community caretaking exception even in cases of mixed motives." ( Ray, supra , 21 Cal.4th at p. 477, 88 Cal.Rptr.2d 1, 981 P.2d 928 (lead opn.).) To the extent the majority finds no evidence in this case that the police went into defendant's garage to investigate a crime, I disagree with its reading of the record. Sergeant Simmont explained that he kicked in defendant's door because he *42 "didn't know what was on the other side" but thought there was "either an armed subject or a victim of gunfire" in the garage. He and his colleagues were investigating a shooting that had just occurred and were looking for potential perpetrators and victims of such a crime. Thus, Ray 's non-emergency variant of community caretaking cannot justify this warrantless entry.
In sum, the warrantless intrusion into defendant's home finds no authority in Ray -neither Ray 's application of the traditional emergency aid doctrine nor its new, non-emergency variant of community caretaking. The majority suggests otherwise by quoting language from Ray 's lead opinion, that the police's "concern justified entry 'to conduct a security check "to see if anyone inside might be injured, disabled, or unable to obtain help" and to determine whether a burglary had been committed or was in progress.' " (Maj. opn., ante , at p. 36.) But the quoted language is the subjective explanation the police gave for their conduct. (See Ray, supra , 21 Cal.4th at p. 468, 88 Cal.Rptr.2d 1, 981 P.2d 928 (lead opn.).) As an ostensible conclusion of law, it is one the lead opinion expressly rejects. In Ray , as in this case, "the People did not meet their burden of establishing circumstances warranting the officers' actions under the emergency aid component of community caretaking" because, although "[t]he officers were concerned for the possibility of an injured person inside the residence," they "had no knowledge of any facts that would lead a reasonable person in their position to believe entry was immediately necessary to aid life or limb." ( Id. at pp. 472-473, 88 Cal.Rptr.2d 1, 981 P.2d 928, italics added (lead opn.).)
Other California cases applying the emergency aid doctrine are no more helpful to the Attorney General. In People v. Stamper (1980) 106 Cal.App.3d 301, 164 Cal.Rptr. 861 ( Stamper ), police responded to a report that two gunshots had been fired within a residence. When they approached and knocked on the door, an officer " 'heard from within the residence what sounded to be like a shotgun being chambered.' " ( Id. at p. 304, 164 Cal.Rptr. 861.) Not surprisingly, the court upheld warrantless entry in that case. ( Id. at p. 306, 164 Cal.Rptr. 861.) Unlike in our case, where the police break into defendant's apartment without any evidence of a firearm, gunshots, or an injured person within, in Stamper the police had evidence that shots had just been fired inside the home, and that somebody inside was again preparing to use a firearm even as the police stood by outside.
Similarly, in Tamborino v. Superior Court (1986) 41 Cal.3d 919, 226 Cal.Rptr. 868, 719 P.2d 242 ( Tamborino ), the police responded to a report of a robbery at an address where a victim "was believed to be injured and bleeding." ( Id. at pp. 921-922, 226 Cal.Rptr. 868, 719 P.2d 242.) Officers responding to the scene observed blood outside the defendant's apartment building and outside his apartment door. Also, a witness "confirmed that an injured person was inside the apartment." ( Id. at p. 922, 226 Cal.Rptr. 868, 719 P.2d 242.) Unsurprisingly, the court held that these facts gave officers sufficient reason to enter in search of injured persons. But our case, with no sign of blood and no witnesses reporting injury, is clearly distinguishable. (See also Troyer , supra , 51 Cal.4th at p. 610, 120 Cal.Rptr.3d 770, 246 P.3d 901 [emergency aid justifies intrusion where "police arrived minutes after a reported shooting to find one victim with gunshot wounds, another bleeding heavily from a head wound, blood on the door indicating an injured victim had entered or exited the residence, a report of a male shooting victim who may still have been unaccounted *43 for, and evasive or unreliable responses from [one victim] as to whether anyone inside needed assistance"].)
The Attorney General also relies on two federal cases that are distinguishable in that both involve police who see evidence that a person in the home has been injured and that violence is ongoing in the home. In Brigham City, supra , 547 U.S. 398, 126 S.Ct. 1943, the officers see and hear a fight taking place inside a house, and then watch through a window as one victim takes a punch to the face, spitting blood. ( Id. at p. 406, 126 S.Ct. 1943.) In Michigan v. Fisher (2009) 558 U.S. 45, 130 S.Ct. 546, 175 L.Ed.2d 410, officers investigating a report of a man " 'going crazy' " find, in the driveway, blood in and on a pickup truck whose front has been smashed, and more blood on the door to the house. ( Id. at p. 45, 130 S.Ct. 546.) Through a window they see a man "inside the house, screaming and throwing things," perhaps at "a spouse or a child." ( Id. at pp. 46, 48, 130 S.Ct. 546.) That the emergency aid exception justified warrantless entry in these two cases means nothing for our case, where the police forced entry into defendant's home without any evidence that there was an injured person in the apartment, and without evidence that violence was occurring, or had occurred, inside the home.
More analogous is a case from a sister state whose supreme court refused to apply the emergency aid doctrine even where there was evidence linking gunfire to a room the police entered. In People v. Davis (1993) 442 Mich. 1, [497 N.W.2d 910], police dispatch alerted officers that a motel desk clerk had called in "Room 33 or 34 ... shots fired." ( Id. at p. 911.) Officers reporting to the scene noticed nothing unusual and chose not to speak with the desk clerk or motel manager, "but instead went directly to the rooms," knocking and announcing police presence at the first door they reached. ( Ibid. ) Although the defendant peeked out the window, she did not open the door to her hotel room for three to five minutes. When she did, the police entered the room without a warrant, found contraband, and arrested her. ( Id. at pp. 911-912.) The Michigan Supreme Court, after carefully analyzing the legal issues, noted the police had no corroboration for the sketchy information they had received from dispatch, and no suggestion "that any person was injured, other than by implication because of the inherently dangerous nature of gunshots." ( Id. at p. 921.) On these facts, the court rejected application of the emergency aid doctrine, concluding that "the constitution prohibits [police] from forcing entry into a dwelling on the basis of a speculation that someone inside may have been injured." ( Id. at p. 922.) (See also United States v. Timmann (11th Cir. 2013) 741 F.3d 1170 [emergency aid doctrine does not justify police entry into an apartment from which a bullet had earlier pierced neighboring apartment's wall].) The emergency aid doctrine is even less appropriate in defendant's case, where there was never evidence of gunfire within (or emitting from) his home.
The majority cites one case that involves police entry into a home without signs of blood or reports of violence within the home. But Ryburn v. Huff (2012) 565 U.S. 469, 132 S.Ct. 987, 181 L.Ed.2d 966 ( Ryburn ) is not a case in which the court had occasion to decide whether the unwarranted intrusion met Fourth Amendment standards. Rather, it is one in a series of cases in which the United States Supreme Court granted certiorari and simultaneously reversed the Ninth Circuit in per curiam opinions because the Ninth Circuit had failed to appreciate that police officers were entitled to qualified immunity in civil cases for damages. ( Id. at pp. 472, 477, 132 S.Ct. 987 ;
*44 Brosseau v. Haugen (2004) 543 U.S. 194, 201, 125 S.Ct. 596, 160 L.Ed.2d 583 ; Stanton v. Sims (2013) 571 U.S. 3, 10-11, 134 S.Ct. 3, 187 L.Ed.2d 341 ; Kisela v. Hughes (2018) --- U.S. ---- [138 S.Ct. 1148, 1154-1155, 200 L.Ed.2d 449, 456].) This, after the United States Supreme Court had repeatedly emphasized to the Ninth Circuit the importance of the distinction between qualified immunity and a decision on the merits of a constitutional claim. (See, e.g., Saucier v. Katz (2001) 533 U.S. 194, 203, 121 S.Ct. 2151, 150 L.Ed.2d 272 ; Safford Unified School Dist. No. 1 v. Redding (2009) 557 U.S. 364, 378-379, 129 S.Ct. 2633, 174 L.Ed.2d 354 ; Camreta v. Greene (2011) 563 U.S. 692, 705-707, 131 S.Ct. 2020, 179 L.Ed.2d 1118.) That is, officials are entitled to qualified immunity unless they have "violated a 'clearly established' right," which means that in an appropriate case a court can enter a defense judgment on qualified immunity grounds "without ever ruling on the (perhaps difficult) constitutional claim the plaintiff has raised." ( Id. at p 705, 131 S.Ct. 2020.) Consistent with this distinction, the Court in Ryburn held that "reasonable police officers in petitioners' position could have come to the conclusion that the Fourth Amendment permitted them to enter the Huff residence" ( Ryburn , at p. 477, 132 S.Ct. 987, italics added), not that the Fourth Amendment did in fact permit the officers' entry.
Questions of qualified immunity aside, Ryburn is also factually distinguishable. In Ryburn , the police entered through an open door, behind a woman whose son had credibly threatened to " 'shoot up' " his school, and after the woman ran into the house upon being asked whether there were guns inside. ( Ryburn, supra , 565 U.S. at pp. 470-471, 132 S.Ct. 987.) Officer safety was a major motivation for the officers' behavior and for the Court's conclusion they were entitled to qualified immunity. ( Id. at pp. 473-474, 132 S.Ct. 987.) And to the extent the officers were concerned with the safety of family members in the home, they were acting on evidence that linked a person in the home to both criminal threats and available firearms. In defendant's case, the police did not invoke officer safety to justify kicking down defendant's door, and they had no evidence tracing criminal threats or firearms to anyone in defendant's apartment, as the only crime they were investigating occurred outside the home and had not been linked to any suspect before the police forced entry.
Although the police had no evidence linking anyone inside defendant's apartment to the reports of shooting outside it, they did have evidence that someone in the garage sought to deny them entry. But defendant, as much as any American, has "the right ... to retreat into his own home and there be free from unreasonable governmental intrusion." ( Silverman, supra , 365 U.S. at p. 511, 81 S.Ct. 679.) He should not need a barricade to fortify that right, and in any event furniture pushed against the door is no match for a determined police officer. The hostility that defendant (and Bazan) exhibited toward the police I do not condone. But nor can I ignore that " 'as a practical matter neither society nor our enforcement of the laws is yet color-blind,' " and the resulting "uneven policing may reasonably affect the reaction of certain individuals-including those who are innocent-to law enforcement." ( United States v. Brown (9th Cir. 2019) 925 F.3d. 1150, 1156 ) That defendant lived in a high crime neighborhood, that a shooting had just occurred outside his home, and that he chose initially to exercise his constitutional right to be left alone in his own apartment do not entitle the police to break down his door. The emergency aid doctrine does not justify the warrantless intrusion into his home.
*45 II. Exigent Circumstances
The Attorney General also argues that the police action in this case comes within the exigent circumstances exception to the warrant requirement. Because warrantless entry into a home is presumptively unreasonable, the government bears the burden of establishing exigent circumstances ( Troyer, supra , 51 Cal.4th at p. 606, 120 Cal.Rptr.3d 770, 246 P.3d 901 ), and we find none that justify forced entry here. Our Supreme Court has defined exigent circumstances as "an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence." ( People v. Ramey (1976) 16 Cal.3d 263, 276, 127 Cal.Rptr. 629, 545 P.2d 1333.)
The Attorney General argues exigent circumstances based, in part, on the officers' reasonable belief that an injured person in the garage needed immediate aid. This is a reframing, under a different label, of the emergency aid argument. (See, e.g., Tamborino , supra , 41 Cal.3d at p. 925, 226 Cal.Rptr. 868, 719 P.2d 242 [exigent circumstances excuse warrantless intrusion into an apartment where police reasonably believe robbery victims might be present].) The argument should be rejected here for the same reason.
But the Attorney General also argues exigent circumstances in that an armed shooter might be in the garage apartment even after defendant has left it. Sergeant Simmont could reasonably conclude "there was a possibility a firefight ... had occurred," and that shooters "may be inside the residence," the Attorney General asserts. (Italics added.) Police may have harbored a "suspicion that activities intended to be hidden were continuing in the home," as the Attorney General alleges, but none of this conjecture rises to the level of probable cause to believe that a shooting suspect was in the garage, and the Attorney General does not argue otherwise.
This shortfall is fatal, for "to fall within the exigent circumstances exception to the warrant requirement, an arrest or detention within a home or dwelling must be supported by both probable cause and the existence of exigent circumstances." ( People v. Lujano (2014) 229 Cal.App.4th 175, 183, 176 Cal.Rptr.3d 534 ; see also People v. Thompson (2006) 38 Cal.4th 811, 818, 43 Cal.Rptr.3d 750, 135 P.3d 3 ( Thompson ) ["entry into a home based on exigent circumstances requires probable cause to believe that the entry is justified by ... factors such as the imminent destruction of evidence or the need to prevent a suspect's escape"]; People v. Bacigalupo (1991) 1 Cal.4th 103, 122, 2 Cal.Rptr.2d 335, 820 P.2d 559 ; [factors that determine "whether exigent circumstances support the decision to make" a warrantless arrest in a residence include "whether probable cause is clear" and "whether the suspect is likely to be found on the premises entered"].)
Here, the totality of the circumstances fails to establish that when the police entered defendant's apartment they had probable cause to believe a shooter would be found there. Although ample evidence established that a shooting had occurred outside the apartment, no witnesses or other evidence placed a gunman inside the residence at any time before the police broke down defendant's door. Indeed, no evidence placed anyone but defendant in the garage at any point that evening, so that once defendant had come into the kitchen, police had no reason to believe anybody-shooter or otherwise-remained in the garage. With Bazan and defendant in handcuffs, the very idea that a shooter remained at large was speculative. This case is therefore clearly distinguishable from Stamper , the primary case on which the Attorney General relies. In Stamper , *46 police received a report of gunshots within the residence and then heard with their own ears the sound of a shotgun being chambered inside the residence. ( Stamper, supra , 106 Cal.App.3d at p. 304, 164 Cal.Rptr. 861.) By contrast here, no sounds at all came from the garage apartment after defendant came out and was detained in the kitchen.
In sum, lacking probable cause to believe a shooting suspect would be found in defendant's apartment, the police could not rely on exigent circumstances to justify breaking down his door and entering his home to look for a shooter.
* * * * *
The majority cites Ryburn for the proposition that "judges should be cautious about second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation." (Maj. opn., ante , at p. 38, citing Ryburn , supra , 565 U.S. at pp. 476-477, 132 S.Ct. 987 ].) But courts do police officers no favors when we abdicate our responsibility to exercise "independent judgment" on the lawfulness of a search. ( Duncan , supra , 42 Cal.3d at p. 97, 227 Cal.Rptr. 654, 720 P.2d 2.)
At stake are bedrock principles of constitutional law. First, " 'the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." ' " ( Thompson , supra , 38 Cal.4th at p. 817, 43 Cal.Rptr.3d 750, 135 P.3d 3.) Second, entry requires a warrant unless the evidence establishes " 'one of the few "specifically established and well-delineated exceptions" to the warrant requirement.' " ( Id. at p. 818, 43 Cal.Rptr.3d 750, 135 P.3d 3.) If today we stretch the emergency aid doctrine to allow intrusion into the home based on only an unparticularized suspicion that an injured person may be inside, or if we dispense with the requirement of probable cause when police are searching for a felon in exigent circumstances, then these exceptions become no longer " ' "few in number and carefully delineated." ' " ( People v. Ledesma (1987) 43 Cal.3d 171, 233, 233 Cal.Rptr. 404, 729 P.2d 839.) Justice Scalia would have the Fourth Amendment's " 'firm line at the entrance to the house,' ... be not only firm but also bright." ( Kyllo, supra , 533 U.S. at p. 40, 121 S.Ct. 2038.)
Because I believe today's decision obscures that line, I respectfully DISSENT.